IN THE MATTER OF THE PETITION OF  V. G. McDONALD, FOR A WRIT of HABEAS CORPUS.

Kansas City Court of Appeals, November 17, 1885.

1.  JURISDICTION—POWER OF THIS COURT TO DETERMINE A CONSTITUTIONAL QUESTION IN CASES OF PETITION FOR WRIT OF HABEAS CORPUS.—The provisions of the state constitution (section twelve, article six), and of section four of the act of March 29, 1883 (Laws of Missouri, 1883, page 215), providing for the amendment to the state constitution creating this court and giving it the same jurisdiction as was conferred on the St. Louis court of appeals, are neither of them restrictive of the jurisdiction of this court as to constitutional questions *except only as to its appellate jurisdiction.* It has no application to the case of a writ of *habeas corpus.* Over this subject matter the jurisdiction of this court, by virtue of the constitution, is original, and is co-equal with that of the supreme court, and its judgment just as conclusive.

2.  STATUTES—VALIDITY OF—SECTION 1697, REVISED STATUTES, DETERMINED—CASE ADJUDGED.—It appearing from the face of the indictment that the offence with which the prisoner stands charged was committed in *Ray* county; and the bill found by the jury of *Caldwell,* and the authority for this exercise of jurisdiction by the grand inquest of the latter county being justified under the authority

of section 1697, of the Revised Statutes (which provides that "when an offence shall be committed on the boundary of two counties, *or within five hundred yards of such boundary*, * * * an examination thereof may be made and an indictment may be found, and a trial and conviction thereon had, in either of such counties)." *Held*, that the bill of rights positively interdicts any other method of final procedure in cases of felony other than by *indictment*. That the indictment must be found *in the same county* where the offence was committed, and no man is to suffer criminally for what he does out of the territorial limits of the county. That said section 1697, of the Revised Statutes, is in violation of the constitution, and is, therefore, void, and that the prisoner is illegally detained and is, entitled to his discharge.

*Discharge ordered.*

Philips, P. J.—The petitioner, W. G. McDonald, stands indicted by the grand jury of Caldwell county as principal in the second degree for the murder of one John Gray.

The indictment states that the offence was committed in the county of Ray, but within five hundred yards of the county line separating the counties of Caldwell and Ray. Under this indictment petitioner was arrested and is confined in the jail of Caldwell county in the custody of the sheriff, the respondent herein. The prisoner petitions this court for the writ of *habeas corpus*, asking to be discharged from said imprisonment and custody on the ground of the alleged illegality of his restraint and detention. The facts, as disclosed at this hearing, are briefly as follows: The offence in question was committed in the county of Ray, but within five hundred yards of the county line bordering on Caldwell county. The petitioner and his son are charged with the killing of said Gray. Information was lodged with a justice of the peace of Ray county, charging petitioner and said son with said offence. Under this proceeding the parties were recognized for their appearance before the circuit court of Ray county to abide the action of the grand jury of said county. The grand jury returned "a true bill" against the son for murder in the

first degree, and returned "not a true bill" as to the petitioner, and he was accordingly discharged.

Subsequently thereto, the grand jury of Caldwell county found a true bill of indictment against the son for this same offence, charging him as principal in the first degree, and also against the petitioner charging him as principal in the second degree. The son was then in jail in Ray county under the indictment found against him there. The authority for the indictment under which the petitioner is held is section 1697, Revised Statutes, which reads as follows: "When an offence shall be committed on the boundary of two counties, or within five hundred yards of such boundary, etc., * * * an examination thereof may be made, and a trial and conviction thereon had, in either of such counties."

The claim of the petitioner is, that the five hundred yards provision of said section is unconstitutional, and, therefore, his detention by the sheriff of Caldwell county is illegal.

I. We are met at the threshhold of this inquiry by the objection of the state that this court has no jurisdiction to determine a constitutional question. By section four of the act (Laws Mo. 1883, 214), providing for the amendment to the state constitution creating this court, the same jurisdiction, as to the subject matter, is conferred on it as on the St. Louis court of appeals. Section twelve, article six, of state constitution confers original jurisdiction on the St. Louis court of appeals over all remedial writs, including the writ of *habeas corpus*, "and to hear and determine the same." Appellate jurisdiction was by the same section conferred on the supreme court over certain subjects cognizable by the court of appeals. Among which are cases involving the construction of the federal and state constitutions. But now, by section five of said act, amendatory of the constitution creating this court, all cases, heretofore reviewable by the supreme court from the court of appeals, go directly from the circuit court to

the supreme court, and not through the courts of appeals. But under both the constitution and the amendment the restriction of our jurisdiction as to constitutional questions applies solely to the instance of the appellate jurisdiction of the court. It has no application to the case of a writ of *habeas corpus*. The jurisdiction of this court by virtue of the constitution is original. There never was any appeal to the supreme court on judgments rendered on petition for this writ. Over this subject matter our jurisdiction is co-equal with that of the supreme court, and our judgment just as conclusive.

In *Ex parte Jiltz* (64 Mo. 205), it is held that when a judge of any court acquires jurisdiction over the person and subject matter under the petition for the writ of *habeas corpus*, the order of discharge, whether right or erroneous, being in favor of personal liberty, is conclusive. The court say : "the judge of the circuit court, having acquired jurisdiction of the person and subject matter, was authorized and required to determine the question as to the legality of the imprisonment, and whether he decided erroneously or not, is immaterial, the discharge of the prisoner being in favor of personal liberty, is final and conclusive. In proceedings by *habeas corpus*, this court only exercises original jurisdiction, and in issuing the writ and determining the questions arising under it, possesses no more power than is possessed by a circuit court or county court, or any judge or officer authorized by law to issue the writ, etc."

The very object of the writ in a case like this being to inquire into the cause and legality of the restraint, it must follow as an inevitable corrollary of jurisdiction that the officer or court issuing it must investigate and determine every question going to the constitution of the legality of the process by which the petitioner is detained. So extreme is the solicitude of the law, and so jealous of the liberty of the citizen are our constitution and statute, that it is made the imperative duty of the judge and court to hear his petition.

And it has ever been recognized as among the unquestioned powers of the court or judge granting the writ to pass upon, primarily, the question as to whether the court or officer, issuing the process under which the prisoner is detained, had jurisdiction, and has acted within that jurisdiction. Cooley Const. Lim. 425.

However much, therefore, we may personally desire to escape the annoyance and responsibility of entertaining these applications, which ordinarily should be addressed to the local tribunals, and of determining the many delicate and intricate questions raised by them, we must obey the mandate of the constitution and statute.

II. It appearing from the face of the indictment that the offence with which the prisoner stands charged was committed in Ray county and the bill found by the grand jury of Caldwell county, and the authority for this exercise of jurisdiction by the grand inquest of the latter county being justified under the authority of said section 1697, we must determine the validity or invalidity of this legislative act.

The bill of rights, section twelve, article two, of the present state constitution, declares : " That no person shall, for felony, be proceeded against criminally otherwise than by indictment, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger."

As this fundamental law positively interdicts any other method of final procedure in case of felony than by indictment, the important question occurs: What is an indictment, by whom and how is it found? This question has been met and fully answered by the supreme court in *Ex parte Slater* (72 Mo. 102). The term "indictment," as employed in the constitution, is held to mean its common law acceptation. That meaning is well defined and understood. Without reviewing the authorities, or re-stating the reasoning, it is enough to say that the common law authorities, from Bacon's Abridgement to our latest text writers, define such in-

dictment to be: "an accusation at the suit of the king (or state) by the oaths of twelve men * * * of the same county wherein the offence was committed, returned to inquire of all. offences in general in the county, determinable by the court in which they are returned, and finding a bill brought before them to be true." And, therefore, by the common law the grand jury cannot regularly indict or present any offence which does not arise within the county or precinct for which they (the grand jury) are returned, and, therefore, it is a good exception to an indictment that it doth not appear that the offence arose within such county or precinct." 5 Bacon's Abridgement, 61.

The common law of England provided no tribunal for punishing what was done out of the county in which the court sat. " The general proposition, therefore, is, that no man is to suffer criminally for what he does out of the territorial limits of the county." 1 Bishop Criminal Law, sections 109–110.

So Norton, J., in *Ex parte Slater*, construed section twelve, of article two, of the state constitution, as if it read : "No person shall, for a felony, be proceeded against criminally, otherwise than by an indictment, that is, otherwise than by an accusation at the suit of the state, by the oath of nine men (at least, and not more than twelve) in the same county wherein the offence was committed, returned to inquire of all offences, in general, in the county determinable by the court in which they are returned, and finding a bill brought before them to be true."

How then is it legally possible to uphold an indictment which declares on its face that the grand jury returning it was not of the county in which the offence was committed ? Nor am I able to distinguish, in principle, the attempt made by the legislature in adopting section 1697, from that of section 1804, denounced in *Slater, supra*, as unconstitutional. The latter act undertook, under a certain contingency, to authorize the grand jury of a county, different from that

in which the offence was committed, to return a true bill of indictment, and to try the offender. So does section 1697. They are both legislative expedients, resting upon the mischievous doctrine of *ab inconvenienti*, to prevent, as the legislature supposed, a failure of public justice in exceptional cases. But the answer of the supreme law of the state, as interpreted by its supreme judicial tribunal, is, that under the genius and letter of our institutions and written constitution, the personal liberty and rights of the citizen are paramount; and, therefore, certain safeguards are erected for their security and preservation, which the legislature itself may not break through.

If the legislature may break over the county boundary five hundred yards, where shall it stop as the constitutional limit? What power shall the citizen appeal to, to say: thus far shalt thou go and no farther? What recognized rule, after it is permitted to go five hundred yards, would prevent it from going five miles, or twenty miles beyond the county line? The constitution says, the county lines constitute the boundary within which a grand jury may investigate the offence of this petitioner; but the legislature say, the grand jury may go over five hundred yards into an adjoining county to indict, and the circuit court of the county, other than that of the venue of the offence, may try and convict.

III.    Nor can this section of the statute be defended on the ground that the legislature designed it merely to establish a rule of evidence for ascertaining the boundary line, in the instance of uncertain and doubtful geographical lines separating counties. The succeeding section, 1698, of the same statute provides for this emergency by declaring: "Where there is a matter of doubt, in the opinion of the court, in which of two or more counties the offence was committed, the court of either in which the indictment was found, shall have jurisdiction of the offence."

This section would seem to be amply adequate to meet the emergency of difficulty in making proof of a

boundary line. If section 1697 were designed by the legislature to perform a like office, and it were susceptible of such construction, the indictment under consideration should have alleged that the offence was committed in Caldwell county, and the state at the trial could, perhaps, have supported the allegation by proof that the offence was committed within five hundred yards of the county line. But there is no uncertainty, no doubt, about the true *situs* of the offence, for the indictment avers that it was committed in Ray county.

IV.   It has ever been esteemed as among our most valuable common law heritages to enjoy the right of trial by jury.   Sir William Blackstone pronounced it "the glory of the English law."   This boon implies not only the privilege of trial *per pais*, but that this jury shall be of our peers, and come from the vicinage—our county—our neighbors.   While the *situs* of the offence draws to it the venue,   the law, which in dealing with a principle always generalizes, proceeds upon the assumption that the citizen ordinarily moves and acts about his residence— his home.   It has, therefore, ever been zealous to accord to him the privilege of a trial at home, among his neighbors.   So, in criminal prosecutions, while the privilege is usually accorded to the accused to take a change of venue, in order that he may escape local prejudice and passion, and to secure a fair and impartial trial, it does not recognize the right of the state to change the venue.   Whereas, if the statute in question is valid, it is plain to be seen how the ancient privilege of the citizen in this respect may be stricken down by the state, and the state secure by indirection a change of venue.   As not infrequently happens in the formation of our counties, four counties may abut.   An offence committed in one of these counties may be within five hundred yards of the corner of all the four.   Under this statute either or all of these counties could indict.   The prosecution, which too frequently passes from the control and management of the public official hand,

into those of private prosecutors, sometimes stimulated by private ambition and personal spite, could select for such prosecution that one most inimical to the accused and most inconvenient to his witnesses, and farthest removed, at the place of trial, from and least in sympathy with, his neighborhood and home influence, wrought, perhaps, by a hitherto unblemished, reputation.

We have in the facts of the proceedings against this prisoner the anomaly of the judicial machinery of two counties being put in motion against him. After he had run the gauntlet of one, the other takes him in hand. Such dual proceedings by two separate jurisdictions are without a common law precedent, and I am unwilling to believe it could have been in the mind of the framers of our organic law and bill of rights to sanction such double vexation of the citizen.

V. It is suggested that a statute similar to this has been upon the statutes since 1845, and that this fact at least is persuasive proof that the legislature has always recognized this as a proper construction of the constitution, and that this fact must have been known to the framers of the constitution of 1875. It might be a sufficient answer to this to say, that no usurpation by a legislative body is consecrated by time, nor can one invasion of the fundamental law justify its repetition.

Strangely enough there does not appear to have ever been any judicial discussion or construction of this statute. If it has, to any extent, been put into practice at *nisi*, it has not fallen under our observation ; though it may have been used. The language of the corresponding provision of the constitution of 1820 is somewhat peculiar, and I think not so broad and significant as that of 1875. Section nine, article thirteen, of constitution of 1820, simply declares that, "in prosecutions on presentment or indictment" (the accused has the right) "to a speedy trial by an impartial jury of the vicinage." It does not positively direct how felonies shall be pros-

ecuted.  It simply declares that in case of prosecutions
by indictment, etc., the accused shall have a speedy
trial, etc.  This language was followed in the constitu-
tion of 1865.  It was supplanted by that of 1875 in the
language above quoted.  This declares the manner of
proceeding against criminals.  It must be by indictment.
This indictment can only be found by the grand jury,
say the supreme court, of the county in which the
offence was committed.  This construction of the exist-
ing fundamental law is authoritative; and a sense of
official duty and respect for the highest court of the
state, compels us to accept and follow its interpretation.

VI.  It is finally suggested by respondent, that
*ex necessitate*, the provision of the constitution in
question must be held to be more or less flexible, else
the effect of the rigidity of our construction would
be to strike down the provisions of section 1696,
of the statute, which authorizes a prosecution of
offenders on steamboats and the like, and on railroad
trains, to be proceeded against in any county along
which the navigable stream or railroad car passes, or
at the terminal point.  That portion of the section
which refers to offences committed on navigable waters
finds its precedent, doubtless, in the common law
method of reaching such cases, while that portion of
it respecting offences committed on railroad cars,
which has latterly become such thoroughfares of travel,
was assimilated by the legislature to the rule of offences
committed on navigable waterways.

Whether this feature of the statute can be main-
tained on this ground is questionable to my mind.  The
determination of this question is not before us, and we
need not discuss its policy or validity.

We have to regret the shortness of the time allowed
us for the preparation of this opinion; but, after the
best consideration we have been able to give the matter
of this petition, our judgment is, that the prisoner is
illegally detained, and is entitled to his discharge.  It
is accordingly so ordered.  Ellison, J., concurs; Hall,
J., absent.