THE STATE v. BLUNT, *Appellant.*

Division Two, May 31, 1892.

1. **Practice, Appellate:** VERITY OF RECORD. The verity of the record of the trial court cannot be controverted, on appeal, by affidavits.

2. ———: ———. Where the record of the trial court has been mutilated or changed, the remedy is by a suggestion of a diminution of the record.

3. ———: ———: ORIGINAL BILL OF EXCEPTIONS. Where the original bill of exceptions is before the appellate court, its recitals will control on the questions whether proper exceptions were saved to the court's action on the instructions and on the motions for new trial and in arrest of judgment.

4. **Murder:** VENUE: STATUTE. Where the fatal shot which caused the homicide was fired in one county, but the death occurred in another, the indictment is properly found in the former county. (R. S. 1889, sec. 3989.)

5. ———: ———: ———. Whether an indictment could be found in the county where the death occurred not decided.

6. **Criminal Practice:** MURDER IN FIRST DEGREE: VERDICT. A verdict which finds the defendant guilty of murder in the first degree as charged in the second count of the indictment, and not guilty as to the first count, conforms to the statute.

The State v. Blunt.

7. ———: ———: SEPARATION OF JURY. The objection, that one of the jurors, in a murder trial, was permitted by the court to separate for a time from the other jurors, must be made at the time, and exception be then saved.

8. ———: EXCEPTIONS. Exceptions to the rulings of the trial court occupy the same footing in criminal as in civil cases.

9. ———: MURDER: INSTRUCTIONS ON MANSLAUGHTER. Where the evidence in a murder trial shows that defendant was the aggressor with no provocation tending to produce "hot blood" in him, there is no error in not instructing on manslaughter.

*Appeal from McDonald Circuit Court.*—HON. JOSEPH CRAVENS, Judge.

AFFIRMED.

*J. W. Brunk, A. J. Harbison* and *O. L. Cravens* for appellant.

(1) The judgment ought to be reversed because of the mutilation of the record. *Medlin v. Platte Co.,* 8 Mo. 325; *Briggs v. Glenn,* 7 Mo. 572; *Dennison v. Co.,* 33 Mo. 168. (2) The instructions certainly do not declare the law: *First.* It is error for the court to refer the jury to the indictment to determine what they must find in order to convict. See the instructions of the court numbered 3, 6, 7 and 8. *State v. McCaskey,* 104 Mo. 644. *Second.* The last paragraph of instruction, numbered 8, on self-defense, given by the court, is as follows: "If you believe from the evidence that defendant wilfully provoked or voluntarily entered into a difficulty with a pistol ready for use, and that in the course of such difficulty, so provoked or entered into by him, he shot and killed Majors, there is no self-defense in this case, and in such case it is immaterial what the peril of the defendant was at the time of the shot." *Third.* It is contradictory and repugnant to the other instructions. *Chrisman v.*

*State*, 54 Ark. 283. *Fourth.* It is vague, uncertain and indefinite; for having a pistol "ready for use" may mean nothing more than having it in an inner pocket of the clothes, with no intention to use it. *Fifth.* The instruction does not require the existence of the felonious intent upon the part of the defendant in the "provoking of the difficulty" and killing of deceased. The difficulty in this case was the result of a sudden quarrel, and deceased first assaulted defendant. *State v. Partlow*, 90 Mo. 608; *State v. Berkley*, 92 Mo. 41; *Chrisman v. State*, 54 Ark. 283; 2 Thompson on Trials, p. 1888; *State v. Herrell*, 97 Mo. 105; *State v. Davidson*, 95 Mo. 155. (3) The instructions offered by defendant fairly and fully presented the law and are not open to any of the objections urged against the instructions of the court. *State v. Thomas*, 78 Mo. 327. In this case instructions for manslaughter ought to have been given. *State v. Davidson*, 95 Mo. 155; *State v. Talmage*, 17 S. W. Rep. 990. (4) One of the hired counsel for the prosecution made use of the following remarks in the closing address to the jury: "Gentlemen, you know that jurors have not, in this great country, always done their duty, and times have arisen, for instance, at New Orleans, when people were impelled to take matters in their own hands because juries failed to do their duty." Defendant objected to the remark, but the counsel received no rebuke from the court. *State v. Jackson*, 95 Mo. 623.

*John M. Wood*, Attorney General, and *L. F. Parker* for the State.

(1) The motion to strike out part of the transcript must be disregarded by this court, as it has no jurisdiction to amend or correct the records of a circuit court, and the affidavits herein filed show that

the record was lawfully and properly made. R. S. 1889, secs. 3239, 3230. (2) The evidence in this case, not being preserved in or referred to in the bill of exceptions, cannot be considered by this court. *State v. Sivils*, 105 Mo. 530, and cases cited. (3) The instructions, motion for new trial and motion in arrest, having neither of them been set out in the bill of exceptions, and said bill of exceptions containing no direction to the clerk to copy the same, and the same not having been copied therein, this court cannot take notice of these, or any of them. *State v. Dunn*, 73 Mo. 586; *State v. McCrary*, 74 Mo. 303; *State v. Robinson*, 79 Mo. 66; R. S. 1889, sec. 2304; *State v. Griffin*, 98 Mo. 672. (4) No pretense of an exception is preserved on either of the following points made by appellant: *First.* There was no exception saved to the action of the court in impaneling the jury. *Second.* Nor to the action of the court in permitting attorneys to assist the prosecuting attorney. *Third.* Nor is there any evidence of any kind preserved, or pretended to be preserved, as to remarks of counsel for the state in closing the argument. *Fourth.* Nor can this court learn from the transcript, under the most loose and liberal construction which can be claimed for it, what the order of argument was. *Fifth.* Nor was there any evidence before the court, nor does the bill of exceptions include, or pretend to include or refer to, any evidence whatever tending to show any separation of the jury. The only thing appearing in the papers with reference to this matter is the affidavit of defendant's attorney, filed after the motion for a new trial and in arrest had been overruled and the appeal granted, and the *ex parte* affidavit of one Ernest Barr filed in this court. Under these circumstances this court will not consider that question. *State v. Musick*, 101 Mo. 260; *State v. Brooks*, 92 Mo. 542. (5) The

instructions, should the court feel justified in examining them, will be found correct, and to follow the latest decisions of this court in every particular. *First.* They are not obnoxious to the objection that they refer the jury to the indictment to determine any ingredient in the offense, as they and each of them include within themselves every ingredient necessary to constitute the offense described, and the reference to the indictment is mere surplusage, and could in no way prejudice the defendant. *Second.* There was absolutely no self-defense in this case, and no evidence on which to base an instruction on either absolute or qualified self-defense, and the *Partlow case* (90 Mo. 608), and cases following that case have no application. *State v. Hardy*, 95 Mo. 455; *State v. Gilmore*, 95 Mo. 554. The defendant was fairly tried, was convicted of a cold-blooded murder, and the evidence leaves no doubt that the verdict is a just one.

MACFARLANE, J.—The defendant was indicted for the murder of Jack Majors, a brakeman on the 'Frisco railroad, and has appealed to this court. The second count, upon which the defendant was found guilty of murder in the first degree, was the following: "And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge, that Newt. Blunt, *alias* Bud Blunt, on the twenty-sixth day of December, 1890, at the county of Newton, and state of Missouri, in and upon one Jack Majors, then and there being, feloniously, wilfully, deliberately, premeditatedly, on purpose, and of his malice aforethought, did make an assault; and a certain revolving pistol, which was then and there a deadly weapon, loaded and charged with gunpowder and leaden balls, and which said pistol so loaded as aforesaid, he, the said Newt. Blunt, *alias* Bud Blunt, in his right hand then and there had and

held, he, the said Newt. Blunt, *alias* Bud Blunt, did then and there, feloniously, wilfully, deliberately, premeditatedly, on purpose, and of his malice aforethought, discharge and shoot off, at, upon, against and in the head of the said Jack Majors; and that the said Newt. Blunt, *alias* Bud Blunt, with the leaden balls, gunpowder and pistol aforesaid, so had and held and discharged and shot off as aforesaid, did then and there feloniously, wilfully, deliberately, premeditatedly, on purpose, and of his malice aforethought, strike, penetrate and wound him, the said Jack Majors, in and upon the head, giving to him, the said Jack Majors, then and there with the deadly weapon aforesaid, namely, the pistol so loaded and charged, as aforesaid, with gunpowder and leaden balls, and so discharged and shot off as aforesaid, in and upon the head of him, the said Jack Majors, as aforesaid, one mortal wound, of the breadth of one inch and of the depth of four inches, of which mortal wound so inflicted as aforesaid, the said Jack Majors from the twenty-sixth day of December, 1890, until a later hour of the twenty-sixth day of December, 1890, did languish, and, languishing, did live, and on which said twenty-sixth day of December, 1890, the said Jack Majors, at the county of Lawrence, and state of Missouri, of the mortal wound aforesaid died; so the grand jurors aforesaid, upon their oath aforesaid, do say and present that the said Newt. Blunt, *alias* Bud Blunt, him, the said Jack Majors, in the manner and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought did kill and murder, against the peace and dignity of the state.

"(Signed)      JOHN T. STURGES,

"Prosecuting Attorney of Newton County."

The testimony in this cause is very voluminous, covering several hundred pages, and it has not been *indexed.*

After reading that testimony under the difficulties attendant on such circumstances, we regard the statement of the conductor of the train, John Gillies, when testifying as a witness, as a substantial statement of the controlling facts in the cause. We, therefore, insert the main portion of his testimony in narrative form, adding thereto hereafter, as occasion may require, brief extracts or results from the confirming testimony of other witnesses. Gillies testified: "When the train stopped at Granby, Mr. Majors stepped off on the platform of the depot. There were five or six passengers who got off at the station of Granby, and when Mr. Majors got on the depot platform this man, though I then knew him as a heavy-set man, but whom I now recognize as Blunt, made to come right up the steps of the platform. Mr. Majors said to him: 'Wait a minute till the passengers get out;' but he still pushed up, and I leaned down and says: 'Hold on a minute until they get out.' I stood this way. There was an old man, a little crippled, was the last. I helped him down to the depot platform, and then I took a step off the platform, this way, and says: 'All right, come on.' There was some ladies, colored and white, got on, but this heavy-set man, Mr. Blunt, he staid on the depot platform. He says: 'I would like to see the son of a bitch that would keep me from getting on a train.' I says: 'Oh, that is all right; we are just waiting to let these people get out so as to make more room for you.' I then turned and walked past the smoking car to the baggage car, up the platform, and says: 'Charlie, is it all right?' talking to Charlie, the agent at Granby, meaning was all the baggage and express on the train. He said 'yes.' I turned around and looked and hollered, 'all aboard!' I saw this man step on the platform of the ladies' coach, signaled to the engineer and the train started.

"After we left Neosho that evening there was a big hand-organ put in the baggage car; it ran on four wheels and was about three and a half feet high—more than that with the trucks; after we left Granby, there was somebody in the baggage car playing the organ; I stood on the platform of the smoking car to hear the playing, may be about a minute; then I turned 'round and walked through the side of the mail department into the smoking-car department, and then walked through and opened the door of the smoker and stepped onto the platform of the smoker; when I got there I found Jack Majors and this man, Mr. Blunt, standing on the platform of the ladies' coach; I stepped over; he says, 'I want to find the son of a bitch that interfered with me getting on this train.' Blunt says: 'I would like to find the son of a bitch that would object to me getting on this train when and as I pleased.' I had my lamp on my left arm, and I raised my lamp and looked in his face to see if the man was drunk, and I did not think he was drunk; I looked in his face to see if he was drunk, and I says: 'Here, you needn't get insulted at all; there was no insult intended to you at all by asking you to stay till the people got off the car; it was to save trouble—you crowding them up, and they crowding you down;' and then he repeated the same thing again about he wished he could find the son of a bitch; and I says: 'You needn't make any trouble here;' and I opened the door of the ladies' coach, and says: "You act like a gentleman and you can go any where you please; into the ladies' car if you want to;' he followed me in, walked up the car to the third or fourth seat on the left-hand side and sat down.

"I started through the coach; he passed me in the ladies' coach and sat down; Majors turned around and went into the smoker; I came into the ladies' coach and he went into the smoking-car from where I saw him; I

started to take up my tickets; I came to Mr. Blunt and says, 'Ticket please;' he handed me a ticket from Granby to Webb City; I punched it, and says, 'You change cars at Pierce City;' and he says, 'Just if I God damn please;' I says, 'There is no necessity for any of that kind of talk; you said you would be a gentle-man; you said you would act like a gentleman; and we expect it;' there was another gentleman sitting down, a Mr. Courter, and I handed him back his ticket; it was from Granby to Joplin, and I says to Mr. Blunt, again, 'Now you want to be quiet.'

"I walked through the car, and as I came along-side where Mr. Blunt was sitting he had a bottle out and a big knife, and he had taken the cork out of the bottle, and I says, 'Here, you can't drink in this car;' he says, 'Well, bring on your son of a bitch,' and he struck at me like that, and I says, 'You don't want to do anything like that,' and he struck at me again and took a drink; I says, 'Now, don't drink in this car; if you want to drink and have a good time, go to the mail-car, the smoker; nobody will bother you at all there;' and he reached again with his knife, and that time the knife slipped across there.

"That was the third time, and I saw the young man that was sitting on the yon side was moving this way. I turned 'round, and walked back three or four seats, and the young man got up and went into the head part of the car. Mr. Blunt got up and went into another seat where there was another man sitting. And I came along by the seat again, and he says, 'Am I in your charge?' I says, 'Just the same as every other passenger is on this train—to see that you get good treatment, that nobody abuses you, and to see whether you get off at your station;' and he says, 'I want you to bring on your sons of bitches, and I will show you what I will do to them.' I says, 'Go into the

mail-car; nobody will bother you at all. But,' I says, 'Suppose there is a lady along there by you, would you want a man coming in here with a bottle and a knife, and drinking, and trying to stab a man?' I says, 'How would you feel about a man going on like that? I want you to understand we have got the United States mail on this train, and if you make a disturbance Uncle Sam will take you in hand, and you won't like it.' And I walked back a little way, thinking I would sit down in the car, but I came up again. 'Well,' he says, 'why don't you bring on your sons of bitches?' I says, 'No, there is nobody going to bother you;' but I says to the young man sitting beside him, 'You keep him quiet.' This young man, Courter, was standing at the water tank. I went out at the door, and as I went to shut the door somebody pulled the door out of my hand; and came out of the door quick; and I could not step over from the ladies' coach to the smoker because he stood right in the aisle. He says, 'Now, where is your God damn sons of bitches interfered with me getting on this train?' I says, 'There was nobody interfered with you getting on this train at all. You are all right.' I says, 'Just walk into this car if you want to. You'll find a good lot of men in there, and nobody will interfere with you at all.' And he kept crowding me down, and he says, 'Now, where's your sons of bitches? Now, where's your sons of bitches?' and the thing was getting serious with me.

"I had one hand on the rail, one foot on the platform, and one on the step; I reached over and called Bruce Kinlock—he was an employe on the train—and I says, 'Bruce, Bruce! Oh, Bruce!' and the passengers came up to the door, and just at that time I heard Jack Majors say, 'Let me out there.' I says, 'Jack, look out! look out, Jack! this man has got a knife.' And Jack says to him, 'Come in this car; I want to go in

that one.' And that man Blunt never said a word to him; I was watching his hand for the knife, and Jack had his lantern in his right hand; but I was so crowded from this side of the coach out onto the steps of the smoker. When Jack got hold of him with his left hand he pulled Jack to him and shoved Jack from him, and Jack fell down that way, and Blunt was half way over him, and as Jack raised up, inside the coach, that man Blunt took that revolver and shot him right in the mouth, and I got up so close to him that the blood spurted out like that over my face and down here. Mr. Blunt stooped over, and the revolver wasn't any further than that—than a foot from Jack's face. —and I saw the bullet hit him; and then he turned to me, and we was going 'round a curve, and the bullet tipped my ear here, and the powder burned my neck here, and then before he could straighten himself up I grabbed his revolver and turned it down that way with my lantern on this arm; and I struggled with him this way, thinking if he shot any more he would shoot our feet, and I pushed him into the ladies' coach, this side; and as I got him there, he had been holding with his left hand, he let go with his left hand, as if to reach me, and then I shoved him off; and then I turned and saw Jack lying there, and I turned and tried to pull the bell cord, but somebody had pulled it; and I says, 'Is there a physician here?' and the passengers all hollered out, 'The conductor is shot,' and I says, 'No, Jack is shot; is there any physician here?'"

Anna Brown, who was in the ladies' car at the time of the homicide, testified that Gillies, the conductor, came around and was taking up the tickets and spoke to Blunt, the defendant, and the latter got up and spoke to him, using profane language, when Gillies tried to induce him to be quiet, and that, as Gillies passed on out to the door of the ladies' car and

toward the smoker, Blunt arose, pulled out his pistol, and said, "I am going to kill them damn sons of bitches," and followed Gillies to the door, and as the latter went to shut the door Blunt drew it back out of his hand, and stepped out on the platform, and then Jack Majors came from the smoker, but was still on the smoker side with his lantern in his hand, and just then the witness heard the pistol fire twice, and saw the flashes.

Mrs. Meador corroborates the testimony of Anna Brown as to Gillies talking to Blunt, though she could not distinguish what they said, and as to the latter going to the door, walking pretty fast, and, when he reached the door of the ladies' car and went out toward the smoker, Blunt arose, took his revolver out of his pocket with his right hand, raised it up so witness could see it, opened the door with his left hand, and went immediately out and very quickly afterwards the shots were fired.

James Morain testified that he heard Gillies tell Blunt he would have to go into the other car if he wanted to drink something out of a bottle. This was at a time when Blunt had taken the cork out of a bottle and was about to take a drink out of it, and as he raised his arm to drink from the bottle, when Gillies put Blunt's arm down, and the latter struck at him with his knife; struck at him three times, and then, when Gillies went on out of the door towards the smoker, Blunt immediately followed him, and then the witness heard two pistol shots fired on the platform between the coaches and saw the flashes, etc.

Similar testimony was given by J. W. Beaver as to Gillies telling Blunt not to drink and the latter persisting in doing so, and then, when Gillies went to the door, followed him out with his pistol drawn, and in a

very short space of time, after Blunt went out of the door, the witness heard the pistol fire, etc.

Corroborating testimony, substantially the same as that first noted, was given by Mrs. Mary Beaver, and by Miss Alice Walker.

Joseph Courter testified that, when Gillies came around taking up the tickets, he took up Blunt's ticket, punched it, and told him to change cars at Pierce City, when Blunt remarked, "Just as I damn please," and that he would like to find the "damn son of a bitch that interfered with him in getting on that train," when Gillies told him that nobody interfered with him; that he just wanted him to wait till some ladies could get off the car, so that he could get on; then the witness testified to Blunt's taking his knife out, taking the cork out of a bottle of whiskey, offered it to witness who declined to drink, and then Blunt started to take a drink himself, when Gillies came up and told him not to drink any whiskey in there; that if he wanted to drink whiskey and have a good time to go forward into the smoker, and, when Gillies told Blunt that, he struck at Gillies several times with his knife, and Gillies left him and went away to the end of the car, when Blunt got up, put his knife in his pocket, pulled out his revolver, and said he "would kill the damn son of a bitch before he left the train." The witness then states that, expecting trouble, he went forward onto the platform, between the ladies' car and the smoker, and was immediately followed by Gillies and by Blunt, when the latter repeated the remark he had previously made, that he "would like to find the damn son of a bitch that had made trouble with him in getting on the train," when Gillies told him that nobody had been trying to make him trouble. Then witness tried to go into the door of the smoker heard Gillies call, "Bruce, come here!" and met others

coming out of the smoker door, when Jack Majors, apparently responding to the call of Gillies for Bruce, or else in the performance of his usual duties, came from the inside of the smoker with his lantern on his arm, and said "Let me pass, boys," when they let him do so, and then Gillies said, "Look out, Jack; he has got a knife," and just then Jack laid his hand on Blunt's shoulder and told him to come into the other car, when Blunt shoved Jack backward and he slipped and fell down, and, as he attempted to arise, Blunt shot him, and immediately turned and shot at Gillies, narrowly missing him and burning his neck; when in a scuffle that ensued for possession of the pistol Gillies was fortunately able to hurl his attempted assassin from the train.

The testimony of this witness as to what occurred on the platform between the two coaches, is substantiated in several particulars by that of Wm. Allen, who was in the smoker and at the door of it, when Jack Majors came to the door and asked permission to pass. Allen had just heard the cry of "Bruce, Bruce!" when he arose and went to the smoker door, and saw the conductor and a man standing close together there on the platform of the ladies' coach and talking, and the conductor was close to the edge of the platform, and when witness, having let Majors pass, stepped in between two seats in the smoker, he heard the pistol fire twice and saw the flashes, and the next thing Majors staggered into the coach fatally wounded.

The foregoing, it is believed, contains all of the prominent facts necessary to a full understanding of the record, except the additional fact that Majors, though mortally wounded in Newton county, died in Lawrence county.

I.   Before entering on the merits of this cause, some preliminary questions must be disposed of.   Affidavits

have been filed in this court on behalf of the defendant,. alleging that the record has been mutilated or altered; that it is not as it exists in the lower court. On this point we may remark that if there is any variance between the record here and that in the trial court, the proper course to pursue, and the only course to pursue, is to suggest in usual form a diminution of the record pointing out the alleged defect, and verifying the suggestion by affidavit. But it is not permitted to controvert the verity of a record by any number of affidavits filed for that purpose. In this cause, however, we have before us the original bill of exceptions which shows that the defendant excepted to the instructions given on behalf of the state, and to the refusal of those asked by the defendant, and that the defendant also saved his exceptions to the overruling of the motions for new trial and in arrest, and the bill also contains directions to the clerk to copy the instructions, and, also, the motions.

As to the evidence, it is contained in the original bill of exceptions, though done in an awkward way. The case of *State v. Griffin*, 98 Mo. 672, therefore, does not resemble this one, and, in determining whether proper exceptions were saved in reference to instructions, motions, etc., we treat the original bill of exceptions as controlling and supplying any defects of the character indicated, though such defects and omissions be apparent in the transcript forwarded here in the first instance.

II. The motion in arrest, as one of its grounds, alleges that "the grand jury had no legal right to inquire into the offense charged, by reason of it not being within the jurisdiction of the court." This ground of objection is supposed to refer to the facts of the mortal wounding of Majors in *Newton* county, and his death in the county of *Lawrence.*

Under the construction given by this court in *Ex parte Slater*, 72 Mo. 102, to sections 12 and 22 of article 2 of the constitution of 1875, an indictment cannot be found in any county but that in which the offense is committed. This ruling was followed by this court, in the subsequent case of *State v. McGraw*, 87 Mo. 161, holding that so much of section 1691, Revised Statutes, 1879, as authorized the crime of burglary to be prosecuted in a county other than that in which it was perpetrated, was constitutionally invalid. And in *State v. Hatch*, 91 Mo. 568, a similar ruling was made by this court with respect to the crime of embezzlement being prosecuted by indictment in a county other than that of its perpetration. The Kansas City court of appeals has followed the same line of ruling, by discharging on *habeas corpus* a person indicted, where the indictment found by the grand jury of Caldwell county showed on its face that the offense, murder, was committed in the county of Ray, but within five hundred yards of the boundary separating the two counties mentioned. This indictment was found upon the authority of section 1697, Revised Statutes, 1879, which permitted an indictment to be found in such circumstances *in either* county. But this section was pronounced unconstitutional on the authority of *Ex parte Slater*, supra. *In the Matter of McDonald*, 19 Mo. App. 370.

We do not think that these authorities and constitutional provisions apply to this cause, because there can be no dispute that the criminal offense, to-wit, the giving of the fatal stroke, the murder, was committed in the county of *Newton*, where the indictment was found, and where, consequently, the circuit court in that county had jurisdiction of the offense. The fact that the death occurred a short time after the county boundary of Lawrence county had been reached was a mere

incident and result of a crime previously consummated in another county. Section 3989, Revised Statutes, 1889, authorizes an indictment to be found in either county, where the mortal blow is given, in one county, and the death follows in another county. This statute is virtually the same as statutes 2 and 3, Edward VI., chapter 24. This statute is the common law in this state, and in others which follow the common-law method of procedure. 1 Bishop on Criminal Procedure [3 Ed.] sec. 52.

The author cited states that, whether, in homicidal crimes, a blow be inflicted in one *jurisdiction* and death follows in another, the crime has been perpetrated *in either*, or, if in either, in which, is a question whereon there is some divergence of judicial opinion; and he states that in Massachusetts a statute authorizing prosecution in the county of the *death* has been held not to violate a constitutional provision of that state; he points out, however, that in Wisconsin, which possesses a constitutional provision very much resembling our own, it has been held that the trial must occur in the county where the offense was committed. 1 Bishop on Criminal Procedure, sec. 50.; *Wheeler v. State*, 24 Wis. 52. So is the ruling in Arkansas, and in other states. *Dougan v. State*, 30 Ark. 41.

But the learned author says that: "The true view appears to be, that the blow is murder or not, according as it produces death within a year and a day or not; and, therefore, in all cases an indictment lies *in the county where the blow is given*." Sec. 51.

Hence, in this case, there can be no doubt as to the indictment having been found in the proper county, the county where the offense was committed, the blow given, and the circuit court of that county had, therefore, jurisdiction, and the indictment is, therefore, not obnoxious to the objection now being discussed. Under

this view we forbear discussing the question, because not presented by the record, whether an indictment would be jurisdictionally and constitutionally valid if found in the county of the *death*.

III.   And the indictment properly charges, for such is the fact, that the mortal wound was inflicted in Newton county, but that the death occurred in the county of Lawrence.   2 Bishop on Criminal Procedure, sec. 534.

IV.   Objection is also taken to the verdict, on the ground that it is insufficient to support the judgment. Here is the verdict:

"We, the jury, find the defendant guilty of murder in the first degree as charged in the second count of the indictment, and we find him not guilty as to the first count of the indictment.

"W. F. JEFFERS,
"Foreman."

It is sufficient to state that the verdict in form obeys the statute, and is correct according to the decisions of this court.   *State v. Montgomery*, 98 Mo. 399; *State v. Jackson*, 99 Mo. 60.

V.   The motion for a new trial, it is now proper to examine.   It contains many grounds upon which it is insisted that the defendant is entitled to have his motion granted.

*a.*   And, *first*, as to the alleged absence of the juror, C. K. Pickens.   It is stated that the court permitted this juror, before the cause was submitted to the jury, to separate from the other eleven jurors, who remained in the courtroom in the jury box, and to go some distance from the courtroom and beyond the view of the court, of the defendant and of the remaining jurors, and against the objection of the defendant,

The affidavit of J. W. Brunk is filed in support of this charge, in which it is stated that the juror

remained out of the courtroom for the space of ten or twenty minutes. An affidavit has also been filed *in this court* by one Ernest Barr, in support of said charge.

If it be true that the juror was absent as stated, the defendant should then and there have excepted to the action of the court, and *saved his exceptions*, which is the only way by which things occurring in the presence of the court can be preserved for review in this court. *State v. Hayes*, 81 Mo. *loc. cit.* 574, 577; *State v. Musick*, 101 Mo. *loc. cit.* 273; *State v. Brewer*, 109 Mo. 648.

There are cases where affidavits will be received by the trial court, and reviewed by this court, as for instance in regard to the misconduct of jurors when out of the presence of the court (*Morgan v. Ross*, 74 Mo. 318); but that is not the point now before us. But another and very cogent reason, as it seems to us, exists, which will justify the action of the lower court and of this court in rejecting said affidavit, and that is that the affidavit, though offered in support of the motion for a new trial, was not made or filed till after the motions for new trial and in arrest had been filed and overruled, and the affidavit for appeal filed and the appeal granted.

*b.* Various other grounds urged in the motion under consideration may be grouped together under one head and thus disposed of: *First*, no exception was saved to the action of the court in impaneling the jury, nor, *second*, in permitting attorneys to assist the prosecuting attorney, nor, *third*, is there any evidence preserved as to what the order of the argument actually was, nor, *fourth*, any evidence preserved showing a separation of the jury. These points, therefore, are not before us for consideration; and cannot be noticed. Exceptions to the ruling of the

trial court occupy the same footing in criminal cases as in those of a civil nature. *State v. McDonald*, 85 Mo. 539, and cases cited.

*c.* And it is almost superfluous to observe that the motions for a new trial and in arrest are no evidence of the truth of the grounds therein stated.

*d.* The defendant, however, did except to the action of the court, in giving and refusing instructions, and excepted as to the overruling of his motions for new trial and in arrest, as already stated. The instructions, given on behalf of the state, speaking of them in a general way, are such as have frequently received the approval of this court. These instructions included murder in the second degree, and also included the theory of self-defense, and this is as far as the instructions went.

*e.* But special objection is urged to an instruction, or the latter portion of the last instruction given on the part of the state. Said objectionable portion of the instruction is in these words: "If you believe from the evidence that defendant wilfully provoked or voluntarily entered into a difficulty with a pistol ready for use, and that, in the course of such difficulty so provoked or entered into by him, he shot and killed Majors, there is no self-defense in this case; and in such case it is immaterial what the peril of the defendant was at the time of the shot." This instruction is clearly wrong when considered with reference to *State v. Partlow*, 90 Mo. 608, and other kindred cases which have since followed that ruling. But that instruction though *abstractly* incorrect was a harmless error, for there was absolutely *no self-defense in the case.*

We have patiently read this record, and have been unable to discover the slightest trace of any occasion arising on the part of the defendant for resorting to

the "first law of nature;" and, in proof of this, we call attention to the testimony as heretofore set forth. Where there is no self-defense, we have frequently decided that errors of the kind complained of will not constitute cause for a reversal of the judgment. *State v. Gilmore*, 95 Mo. 554; *State v. Tabor*, 95 Mo. 585; *State v. Anderson*, 89 Mo. 312; *State v. Bryant*, 102 Mo. 24.

*f.* It is claimed that an instruction should have been given for manslaughter, but to this we do not agree. There are no circumstances in this whole record indicating hot blood, nor any legal provocation tending to produce hot blood in the defendant. He was the aggressor throughout from the turbulent beginning to the fatal ending. He had no cause to be offended when rudely pushing his way up through the crowd of passengers descending from the cars, because he was requested to "wait a minute till the passengers get out." It was the duty of the brakeman and of the conductor to endeavor to prevent the departing passengers from being jostled or hustled, as they were seeking egress from the cars, and it was equally the duty of the defendant to wait till the outcoming passengers had safely alighted before he attempted to ascend the steps of the cars; but this duty the defendant did not observe. The obligation of the carrier begins with the reception of the passenger, and it does not end until the latter has safely alighted from the car. Safety and convenience of ingress to, and egress from, the cars is a part of the contract of carriage, and this must include the right of the passenger to leave the car without being unnecessarily or rudely crowded or jostled by incoming passengers while he is descending the steps of the car. This right of the passenger implies on the part of the carrier the corresponding duty to protect the

passenger in the exercise of that right. 2 Rorer on Railroads, 964, 965. "The business implies a degree of authority in those conducting it, as to the direction and management of trains, their progress over the road, and in regard to the time and manner in which passengers shall enter upon and depart from the cars, and the conditions upon which they may remain thereon, that is little less than absolute."

"It has a right to require that passengers shall preserve order; that they shall be seated, and not stand up in the passage way or upon the platforms; and that they shall abstain from any act which tends to impede or interrupt the conductors and managers in the transaction of their necessary business." Sec. 980, and cases cited.

"The conductor is regarded as supreme in authority on the train, as if a captain on board ship, and his acts are the acts of the company." Sec. 964.

And the carrier is liable in damages, if it fail to eject from the cars drunken, disorderly or riotous persons, who assault or annoy other passengers. Sec. 965.

Another author says: "The rules of law require a passenger to conduct himself with decency, and not to render himself an offense or annoyance to others, and, for failing to observe these rules, a man may and should be removed from the car." Cooley on Torts [2 Ed.] 774.

Under these principles of law, the conductor and brakeman were in the right from the beginning, and the defendant equally in the wrong. Then take his conduct on the train, his every act and profane and indecent expressions were evidently intended to provoke a collision between the conductor and himself, and, failing in inducing by his boisterous

and indecent conduct and insults such collisions he waits till he sees the conductor leave the car, and then he draws his pistol and follows after him, saying as he went, "I will kill the damn son of a bitch before I leave the train."

When he reached the platform, he crowds tne conductor down on the steps of the car, as if to throw him off the train, frequently repeating his insulting expressions, until the conductor finding himself in serious danger was forced to call for Bruce, when Majors, responding to the call, came, laid his hand on the defendant's shoulder, and asked him to come into the smoker, when the defendant drew Majors forward, then shoved him backward, and when Majors fell, he shot him as he attempted to arise, and then fired on the conductor, barely missing him.

Majors had the right to go to the rescue of the conductor, *first*, in the endeavor to preserve order and the peace on the cars, and, *second*, to prevent felony from being committed, or the conductor from being seriously injured, and the act of Majors in doing this cannot be characterized as being an assault, or as meriting the murderous treatment he received.

Carefully considering the whole testimony in this cause, we feel constrained to say that there is not a single palliating feature in this cause which even tends to reduce the crime of the defendant below murder in the first degree; on the contrary, his entire conduct, from beginning to end, shows "a heart regardless of social duty and fatally bent on mischief."

We affirm the judgment, and order that the sentence pronounced by the law be executed. R. S. 1889, sec. 4298; *State v. Pagels*, 98 Mo. *loc. cit.* 317. All concur.