**STATE of Missouri, Plaintiff-Respondent,**

v.

**Fred Douglas PARKER, Defendant-Appellant.**

No. 51488.

Supreme Court of Missouri,
Division No. 2.

June 13, 1966.

Norman H. Anderson, Atty. Gen., Jefferson City, James J. Sauter, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Stewart v. Bruntrager, Raymond A. Bruntrager, Joseph G. Stewart, St. Louis, for appellant.

BARRETT, Commissioner.

Because he shot and killed his half brother, Sterling Bourne, the appellant Fred

D. Parker was charged with murder in the second degree. RSMo 1959, § 559.020, V.A.M.S. A jury found the appellant guilty of the lesser and included offense of manslaughter (RSMo 1959, §§ 556.220, 559.070, V.A.M.S.; State v. Foster, Mo., 338 S.W.2d 892), and since he had a prior felony record of two convictions (RSMo 1959, § 556.280, V.A.M.S.), including another manslaughter conviction, the court fixed his punishment at ten years' imprisonment. RSMo 1959, § 559.140, V.A.M.S.

Sterling Bourne, age 37, was a large man, the witnesses said six feet one, two or three inches tall, weight 230 to 260 pounds. The pathologist who performed an autopsy and recovered one of three bullets from his body said that "by actual measurement he was six feet tall" and weighed "approximately 220 pounds." He had once been in a veterans' hospital for what his mother described as a "nervous breakdown" or "some nervous disturbance" and in describing Sterling she said that he "always wanted to boss all his brothers." Fred's precise height and weight do not appear but he was obviously much smaller than his brother.

In brief, the state's evidence was that on September 7, 1964 (Labor Day), Sterling had an all-day barbecue in his backyard at 4324 Lexington Avenue. There were a large number of "floating" guests, fifteen to twenty most of the time, young and old, relatives and friends, including his half brother Fred Parker (who brought along his drinking companion Gulley) and their mother Evelyn Williams. The guests were not all personally acquainted with one another, however, and some were particular friends and partisans of Sterling's and some, at least two, were friends and adherents of Fred's. Some witnesses say that Parker arrived at the party in early afternoon, 2 to 3 o'clock, Gulley says 4 to 4:30, but all the witnesses were quite indefinite as to time and very vague as to conversations. In any event all the witnesses agree that Fred and Sterling were "arguing," some said that they were arguing "about Fred's children," but most witnesses were like Gulley, "I don't know how the argument come up, but Sterling was doing most of the talking." But it was at this point in the day's events that "all of a sudden," their mother said, "I turned around and Sterling had him in his arms like this, shaking him. * * * Then he threw him on the ground and he hit him up beside his head. * * * No, Fred didn't say anything to Sterling * * * at least I didn't hear him say anything to him, and when I turned around, I was eating, I told you, and when I turned around he had Fred up shaking him like a dish rag (indicating)." Fred did not fight back and "He (Sterling) finally let him go hisself" and thus that phase of their encounter ended. As to why and how it ended, Gulley said, "That is a little confusing, I can't say definitely who stopped it, or how it was stopped, but after it was broken up, well, I imagine about four or five minutes elapsed before the next thing I know he had him again, and threw him down again, and punching him." Some time elapsed after this episode, Gulley says five minutes, and Fred was going to leave on an errand and, according to their mother, "Sterling grabbed him again and knocked him down." But immediately Fred got up and "put his arms around him (Sterling) and said that was his big brother and he * * * He kissed him and said he was—he wouldn't let nobody hurt him, and he wasn't going to hurt him and wouldn't let anybody else hurt him." Carrie Blue, another guest, had gone in the house and "looked out and they were both on the ground, and one of them (Fred) said to the other one, 'I won't hurt my own brother, I love my brother, my brother, and we are not going to hurt each other.' * * * They was hugging each other" and Fred kissed Sterling and then left.

As Fred and Gulley were leaving, Rose Hughes says 15 to 20 minutes after the second encounter—Gulley said, "I guess maybe about an hour or forty-five minutes, something like that"—Rose yelled and asked

Fred to bring her a package of cigarettes. Fred and Gulley left in Fred's truck; they went over on Newstead and St. Louis Avenue to a liquor store and "bought cigarettes and a couple of half pints of gin." They were "gone for quite a while" and came back to the party to pick up Fred's kids. No one seemed to particularly notice just when Fred returned but all agree that Sterling was sitting on the wooden bench at the barbecue table between Rose and a man and this is their mother's version of the shooting: "I was over at the barbecue pit and tending to some barbecue that was half done. * * * While I was standing there I heard a shot, and when I turned around Sterling was falling back off of the seat, the barbecue seat. * * * I saw him falling back. * * * Well, Sterling was crawling back across, and he shot him again, and then at that time I ran up the steps to call the police * *." Sterling was "crawling" towards a fence, most witnesses said scooting on his back, when Fred fired the second and third shots into his thighs. Sterling's wife was in the house and heard a shot, she "looked through the window, because I was sitting by the window, I saw Fred pointing the gun towards Sterling and he was falling from the bench on which he was sitting. Then I ran downstairs right then, * * * and on the way down I heard another—something that sounded like another shot, and I came outside and ran up to him, and I saw the third shot, and I threw my body across him. * * * He had crawled to the fence that was about, oh, about ten or fifteen feet from the bench." And Sterling said "Don't shoot me, Fred, I won't prosecute, don't shoot me." And Sterling's wife continued, "Fred came up to two feet of me, kicked after me and said, 'You had better get up from there or I will shoot you too,' and he fired a shot that went over my head and—well, he was still there with the gun, and then he backed off again and shot another shot in the ground, directly in the ground, and looked and said, 'I guess you had better take him to the hospital now.'" She was positive that a

total of five shots were fired and in this and in Fred's threats to shoot her she was corroborated by Carrie Blue.

The police were called at 6:08 and Officer Kroeck walked up to the appellant and "asked him if there was a shooting there" and Fred said, "Yes, something happened in the alley" and as the officer went to investigate the appellant, Gulley and Rose Hughes all left in Fred's truck and were arrested at 7:20 that evening. The arresting officer found a nine-shot .22 caliber pistol on the floor of the truck, the cylinder had been removed and was wrapped in a newspaper and there was one live bullet in the cylinder. The appellant said that it was his gun and he admitted that he had shot his brother with it.

■ This evidence and these circumstances support, of course, the included charge of manslaughter (State v. Richardson, 364 S.W.2d 552, 554) and are set forth in some detail as necessary background for the appellant's briefed and argued assignments of error.

■ The first complaint is that the court erred in permitting the state on redirect examination of Officer Kroeck to read in evidence that part of a police report setting out what Evelyn Williams had said because it also purported to contain what a child, Eva Rice, had said as to the number of shots fired. As the appellant urges, the police report was hearsay and was of course inadmissible in evidence for possibly a number of reasons not necessary to mention here. State v. Gregory, 339 Mo. 133, 96 S.W.2d 47; State v. Gorden, 356 Mo. 1010, 204 S.W.2d 713. But this subject was not mentioned until the appellant's cross-examination of Officer Kroeck when there were these questions and answers:

"Q. Did anybody tell you, any of the witnesses, there were more than three shots fired?

"A. Eva Rice, I believe it was."

\* \* \* \* \* \*

"Q. You would have put that in the report if she differed with the other witnesses?

"A. Due to her age and the number of shots, it was just a little out of line."

\* \* \* \* \* \*

"Q. Officer, the question I asked you, if Eva Rice told you it was more than three, wouldn't you put that in your police report?

"A. Due to the fact I did not—she corroborated Evelyn Williams, the series of events were the same except for the number of shots.

"Q. Did you put that in there?

"A. According to their statement, all nine or ten shots, it was a little outrageous."

When state's counsel on redirect examination started into this subject over defense counsel's objection the court overruled the objections stating "it's just corroboration," meaning no doubt "cumulative." In any event this is all there was to it: "Q. You testified you reflected that statement in the police report to the extent that Eva Rice corroborated Williams' statement, isn't that correct? A. Yes, sir. Q. Evelyn Williams' statement? A. Yes, sir." There are other details connected with this incident but the appellant having interjected the whole subject into the case, largely no doubt for the purpose of discrediting the officer, is now in no position to complain of the state's explanation on redirect examination. Affronti v. United States, 8 Cir., 145 F.2d 3; State v. Schenk, 238 Mo. 429, 456, 142 S.W. 263, 270.

The court gave Instruction 3 upon the subject of self-defense, and the second paragraph attempted to submit the hypothesis that Fred "unnecessarily" shot and wounded Sterling "when he did not have reasonable cause to believe that the said Sterling Bourne intended to kill him or to do him some great bodily harm, or that the

defendant Fred Douglas Parker wilfully sought or brought on the difficulty *or voluntarily entered into such difficulty, then in that case the defendant cannot justify himself on the ground of self-defense and you cannot acquit him on that ground."* As the appellant urges, the instruction is erroneous and why after more than twenty-six years of condemnation it would be resurrected, probably from State v. Roberts, 280 Mo. 669, 217 S.W. 988, and again given is not known. In State v. Miller, (1940) 346 Mo. 846, 849-850, 143 S.W.2d 241, 243, the court lists the previous six cases condemning the instruction for the reason " 'that expressions so broad and unqualified include even voluntary acts of the defendant done in self-defense. It is said, in other words, that if a defendant is attacked without provocation on his part and voluntarily defends himself, he voluntarily engages in the fight, and yet by such an instruction he is denied his legal right of self-defense.' " The objection to this phase of the instruction is that it tells the jury that even though the defendant is attacked by the deceased he "voluntarily" engages in the combat and is thereby deprived of his right to self-defense. State v. Williams, 337 Mo. 884, 893, 87 S.W.2d 175, 179, 100 A.L.R. 1503. The state does not defend the instruction but contends that there was no evidence upon which to base the hypothesis of self-defense and, therefore, the submission of the issue was more favorable to the appellant than he deserved and any error in the instruction harmless—"the defendant suffered no damage from the error, because there was no evidence of self-defense in the case." State v. Lewis, 118 Mo. 79, 85, 23 S.W. 1082, 1084; State v. Reed, 137 Mo. 125, 134-137, 38 S.W. 574, 576-577; State v. Blunt, 110 Mo. 322, 342, 19 S.W. 650, 655; State v. Gilmore, 95 Mo. 554, 564, 8 S.W. 359; State v. Baker, Mo., 277 S.W.2d 627. Thus there arises and is presented upon this appeal the meritorious question of whether there was any evidence that Fred Parker shot his half brother Sterling Bourne in self-defense necessitating a correct and proper instruc-

tion on the subject. State v. Wright, 352 Mo. 66, 175 S.W.2d 866.

■ "The right to kill in self-defense is founded in necessity, real or apparent" (26 Am.Jur. [Homicide], § 137, p. 249) and before such extreme measure may be lawfully resorted to the record must show that the appellant acted "under at least an apparent necessity, in order to save himself from death or great bodily harm." 40 C.J.S. Homicide § 114, p. 983; State v. Page, Mo., 130 S.W.2d 520, 523. Insofar as material to this case, the language of the *justifiable homicide* statute is that "Homicide shall be deemed justifiable when committed by any person in either of the following cases: * * * (2) When committed in the lawful defense of such person * * when there shall be reasonable cause to apprehend a design * * * to do some great personal injury, and there shall be reasonable cause to apprehend immediate danger of such design being accomplished." RSMo 1959, § 559.040(2), V.A.M.S. Under the general rules and the statute reasonable cause and necessity are to be viewed in the light of the circumstances as they appeared to the defendant. 40 C.J.S. Homicide § 126, p. 1003. But there must have been some act or demonstration on the part of the deceased inducing a reasonable belief that the defendant is about to suffer great bodily harm (26 Am.Jur. § 142, p. 255), some overt act of presenting or drawing—"Where the deceased has acted in such manner as to induce a reasonable belief that he is preparing or attempting to use a deadly weapon, such action will constitute sufficient ground for apprehension of danger to justify the defendant in taking extreme measures in self-defense, but this rule will not apply where there is no reasonable ground for apprehending immediate danger." 1 Warren, Homicide, § 155, p. 740. With these general rules in view as background "(a) 11 of the attendant facts are important in determining whether the killing of a person by the accused was done in self-defense." 26 Am.Jur. § 142, p. 255.

■ The essentially substantive evidence adduced by the state has been noted and in it there are no circumstances that would justify the hypothesization of a justifiable killing. In this particular case there were no threats (State v. McGee, 361 Mo. 309, 315–316, 234 S.W.2d 587, 591), the only relevant circumstance established from the state's witnesses was Sterling's size and strength but on that score the appellant had no more to apprehend than another simple assault and battery (40 C.J.S. Homicide § 123a, p. 999) and that alone would not justify a killing in self-defense. And, it should be noted, no gun or other weapon was found on Sterling. As stated, the circumstances relating to reasonable cause and necessity are to be viewed in the light as they appeared to the appellant but in this case, unlike a number of instances, Fred did not testify and there is no way of judging his subjective state or just what he may have in fact apprehended, and ultimately the sufficiency of the evidence to support the hypothesis of a killing in self-defense, except as it is inferentially made to appear from the testimony of others.

Two witnesses, his friends Gulley and Rose, testified on behalf of the appellant and if there is a circumstance warranting the submission of self-defense it must be found in their testimony. Fred and Gulley had been together since midmorning, riding around in Fred's truck and drinking, and Gulley had seen the .22 caliber revolver in the glove compartment because it "didn't have a door on it." However no one seems to have known when the gun was transferred to Fred's person. Gulley says that after running their errand they returned to Sterling's barbecue and as they walked across the backyard Sterling was sitting on the bench of the barbecue table, Rose on his left and another man on his right, Fred was "on this other side of the table," opposite Sterling and he says, "There was a few words passed, but what was said I don't know." But as Fred tossed the cigarettes to Rose he thought Sterling

said, "'Nigger, why didn't you clean up,' or something to that effect." Gulley says that at that juncture he moved around on the side of the table,

"—and Sterling lunged up from the table, and that is when I heard the shot."

\* \* \* \* \* \*

"Q. You say Fred shot at his brother as he lunged toward him, is that the idea?

"A. Yes, sir."

\* \* \* \* \* \*

"Q. How many times did he shoot, do you know?

"A. I only heard three shots fired."

\* \* \* \* \* \*

On cross-examination these were the questions and answers to and by Gulley:

"A. \* \* \* He (Fred) was about three feet from the table."

\* \* \* \* \* \*

"Q. Now, did Sterling Bourne lunge across the table at him? A. Yes, sir.

"Q. He came across the table?

"A. He was getting up as if to come across the table.

"Q. And— A. When he was shot."

\* \* \* \* \* \*

"Q. And you never saw the gun in Fred Parker's hand prior to hearing the first shot?

"A. No, I didn't."

\* \* \* \* \* \*

"Q. And we have got Sterling Bourne starting to come across; which way did he come originally?

"A. Across, when he came out from the table, after he was shot, I imagine.

"Q. Before he was shot which way did he go?

"A. Toward leaning over the table."

\* \* \* \* \* \*

"Q. Did he make any effort to put his foot up to climb over the table?

"A. No.

"Q. You heard a shot? A. Yes, sir.

"Q. Then what did he do?

"A. Oh, I can't say; he rose and had moved and he came out from the table."

These were the crucial questions to and answers by Rose:

"Q. What happened when Fred came back in?

"A. Well, when Fred came in I said to him, 'I bet you forgot my cigarettes,' and he said, 'No, I didn't,' and he tossed them to me. At that time I got up from the table, and I wasn't side by side of Fred, I was very close to him, and as far as I can remember they started talking or I would say arguing, you know, and Sterling motioned to get up, you know, he was in the process of getting up, and it looked to me as though he was getting ready to go in his pocket.

"Q. All right.

"A. That is what it looked like to me.

"Q. Then what happened?

"A. After then I heard the shot."

On cross-examination:

"Q. You don't know which one said which?

"A. I don't know.

"Q. Then you said Sterling, and what did Sterling do?

"A. He was in the process of getting up.

"Q. All right. Did he get fully up or was he in the process of getting up?

"A. I said he was in the process of getting up, in a position like this (indicating).

"Q. Where was his hand?

"A. Well, his right hand looked to me—that is the way it looked to me as though he were going in his pocket.

"Q. Now, would you tell us exactly what he did with his right hand, how did he go?

"A. You might say like a man would get ready—.

"Q. In the process of getting up from the bench and going like this, too?

"A. Well, like say you were getting ready to go in your pocket, how would you look?"

* * * * * *

"A. He wasn't reaching in his pocket, I said it looked to me he was getting ready to go in his pocket.

"Q. He was getting ready to go?

"A. I didn't say he put his hand in his pocket."

It is not necessary to characterize this testimony or to separate conclusions from statements of fact, or to indicate permissible inferences, it is self-explanatory and it is not of such probative force as to compel an instruction submitting the hypothesis of a killing in self-defense. "Certainly, at the time the fatal blow was struck by the appellant, he did not have reasonable ground to believe that the deceased was about to take his life or do him great bodily harm. As there was no evidence to sustain an instruction on self-defense, it was not error to refuse it." State v. Bennett, Mo., 87 S.W.2d 159, 164. And to note only briefly, in addition to the Bennett case, the cases nearest in point in theory and factually are State v. Wilson, 98 Mo. 440, 11 S.W. 985, and State v. Lewis, 118 Mo. 79, 23 S.W. 1082. In State v. Wilson, "I said 'I don't want you to say that any more.' Graves raised the shovel to his head like that, and said 'the way is open; pitch in.' I hoisted the hoe. * * * I just wanted to keep him from killing me.

When Graves drew the shovel I drew the hoe." The court said, "The danger must be apparent and impending and one from which defendant cannot, without further hazard, apparently deliver himself, except by striking the fatal blow. There is not a particle of evidence in the whole case which tends to show that, from the beginning of the altercation until the fatal blow was struck, the defendant had any reason to believe he was in imminent danger. * * * This was no case for an instruction on self-defense, and defendant would have had no cause to complain if none had been given; much less to criticize those that were given." In State v. Lewis the deceased came along the street with his overcoat on and his right hand in his right pocket and the defendant said, " 'Howdy, Alf'; and deceased replied, 'You son-of-a-bitch,' whereupon the deceased started to turn around facing defendant, making at the same time an effort to pull his hand out of his pocket, when defendant drew his pistol, and shot deceased in the head, back of the left ear * * *. After the death of Spencer, a slung shot was found tied to his right arm, his hand still being in his pocket." As to error in a self-defense instruction the court said, "there was no evidence of self-defense in the case."

■ Citing a single civil case, Streeter v. Washington Fidelity National Ins. Co., 229 Mo.App. 33, 68 S.W.2d 889, the appellant has a third assignment of error in which it is complained that it was error to include in the hypothetical question to Dr. Mitchell, who operated on Sterling for his gunshot wounds, "the assumption that the deceased was in good health because there was no evidence to support it." In this connection it is said that the only evidence in point indicated that he was in poor health. The latter statement is based on the fact that Sterling had once been in a mental hospital for three months, that he was obese and that he had an unusual and constant thirst for water. It is not necessary to consider this assignment in detail and in the light of this record, the objection amounts

to no more than a technical violation of the general rules relating to hypothetical questions to doctors, even if erroneous there is no attempt to demonstrate just how the error may have been manifestly prejudicial to the appellant. 32 C.J.S. Evidence § 551(2) d, pp. 534–535; State v. Beckner, 194 Mo. 281, 91 S.W. 892, 3 L.R.A.,N.S., 535; Schrader v. Kessler, Mo., 178 S.W.2d 355.

For the indicated reasons the judgment is affirmed.

STOCKARD, C., concurs.

PRITCHARD, C., not sitting.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.