**STATE of Missouri, Respondent,**

v.

**Samuel BRADFORD, Appellant.**

**No. 54831.**

Supreme Court of Missouri,
Division No. 2.

Jan. 11, 1971.

Motion for Rehearing or to Transfer to Court
En Banc Denied Feb. 8, 1971.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Special Asst. Atty. Gen., St. Louis, for respondent.

Robert C. Babione, St. Louis, for appellant.

JOHN J. KELLY, Jr., Special Judge.

Defendant was charged with Robbery First Degree by Means of a Dangerous and Deadly Weapon, a shotgun. The jury found him guilty and the Court sentenced him to seventeen years imprisonment in accordance with the jury verdict. This appeal followed.

Because of some of the points relied on by the defendant in his appeal we feel it necessary to set out in detail the facts as the jury could have found them from the evidence in the case. At approximately noon on November 30, 1967, James W. Roady and Lawrence J. Hannegan, employees of the St. Louis Pay Truck Company, Inc., arrived, as was their custom every other Thursday, in an armored truck furnished by their employer, at the Parkview Avenue entrance to the Jewish Hospital in the City of St. Louis. Roady was a cashier and Hannegan a cashier-driver for their employer; each was armed with a Smith and Wesson .38 Police Special sidearm and wore a hat and badge identifying them as employees of the check-cashing service. Their purpose in being at the hospital was to cash payroll checks for the employees of the hospital on payday. They alighted from the armored truck, each carrying a green bag containing Twenty-Nine Thousand Five Hundred Dollars ($29,-500.00) in currency and One Hundred Fifty Six Dollars ($156.00) in silver, a total of Fifty Nine Thousand Three Hundred Twelve Dollars ($59,312.00). They then entered the Parkview Avenue entrance to the hospital with the bag of money in one hand and their gun in the other, walked through the lobby of the hospital, through a doorway and down a staircase to the door into the basement hallway of the hospital. As they entered the hallway, they observed a table similar to tables used in a morgue, and two colored men standing one on each side of the table with their lower arms and hands covered by their coats, and resting on the table. When Roady entered the basement each of the colored men displayed a sawed-off shotgun from under his coat and defendant, who was attired in a dark blue "Shane" guard uniform, told Roady: "I'll take that." Defendant then seized the bag of money and gun from Roady and ran from the scene; another of the robbers (Hill) took the other bag of money and gun from Hannegan, and then a third colored man (Lee) ordered Roady and Hannegan into a locker room nearby and told them to stay there for five minutes, and not to stick their heads out of the room or they

would have their heads blown off. All three of the robbers left the building and escaped in a getaway car driven by one "White" which had been waiting near the Newstead Avenue entrance to the hospital. The entire incident took maybe a little more or a little less than two minutes.

After the robbery was completed, the four robbers went to "White's" house where they split the loot, defendant getting Ten Thousand Five Hundred Dollars ($10,-500.00) as his share. After this he went to East St. Louis, Illinois, where he remained for a short time, and then to Chicago, Illinois, where he remained until he was taken into custody by agents of the Federal Bureau of Investigation on December 13, 1968.

During the course of the trial Roady identified the defendant as the robber who was dressed in the Shane uniform and took the bag of money and gun from him. Hannegan was not asked if he could identify defendant as one of the robbers. One witness for the State, Charles Noble, testified that he had known the defendant as a fellow employee of the Jewish Hospital for almost three years prior to the robbery and that he had seen and talked with the defendant just a few minutes prior to the robbery near the scene described by Roady and Hannegan as the place where the robbery occurred. Noble further testified that the defendant was at that time dressed in a blue guard's uniform like those worn by Shane employees. A confession made by the defendant was introduced in evidence over defendant's objection and defendant took the stand in his case and testified that he did not disclaim the statement he had given the Assistant Circuit Attorney after his return to St. Louis from Chicago, Illinois, and also, on both direct and cross-examination, he made damaging admissions tying him to the robbery for which he was on trial. During his testimony he stated that he was, on the day of trial—May 20, 1968—twenty-four years of age, a high school graduate and had been employed by the Jewish Hospital as an adult psychiatry worker. He also admitted that he had been employed by the Shane Detective Agency as a part-time guard. The statement he told his defense counsel that he did not disclaim was admitted into evidence as State's Exhibit 1, and contained a comprehensive account of how the idea arose in the defendant's mind to execute the robbery some two weeks prior to its actual commission, its planning stage with Hill, Lee and White, the actual facts of the robbery events, the escape, and the splitting of the loot. On cross-examination, defendant admitted entering the hospital with a sawed-off shotgun under his coat and stated that the uniform he was wearing at the time of the robbery was one issued to him by the Shane Detective Agency.

In ruling on defendant's appeal we have presented to us for consideration six points of alleged error committed by the trial court. The first three points relied on by defendant concern alleged errors which we can consider together because of the result we have reached hereinafter. Point number one is that the trial court committed error in overruling defendant's pretrial motion to suppress the testimony of James Roady insofar as his identification of the defendant as one of the robbers is concerned, and that he further erred in failing to sustain defendant's objection to the identification of the defendant by Roady during the trial because such testimony was hearsay. Point number two is that the trial court erred in not sustaining defendant's pretrial motion to suppress defendant's statement because the record fails to disclose (1) that the defendant was truly in a position to exercise his right to counsel, (2) that he intelligently waived his right to counsel, or (3) that he made his statement voluntarily. Defendant's third point is that the trial court erred in refusing to give an instruction tendered by the defendant on voluntary statements even though there was evidence of mental coercion and lack of an intelligent waiver of counsel.

To fully comprehend defendant's contentions it is necessary to state the evidence

offered in support of his position on these three points. As stated previously, the offense occurred on November 30, 1967, and there is no evidence that Roady had ever seen the defendant before that time or recognized him from any other meeting. The actual robbery, in Roady's words, took: "Oh, I would say about—that is hard to say; maybe two minutes, maybe more, maybe less. Q. It seemed like a very short time? A. Yes, a very short time." The next time Roady saw defendant was on December 27, 1968, when he was present in Division No. 16 of the Circuit Court of the City of St. Louis at the instigation of the Circuit Attorney's Office and the St. Louis Metropolitan Police Department to see if he could identify the defendant while he was being arraigned on an indictment returned by the Grand Jury for St. Louis on January 30, 1968, charging him with this robbery. According to the testimony of the only witnesses offered both in support of defendant's motion to suppress and in opposition thereto—defendant himself and Detective Oscar Farmer—the following occurred on that occasion. Roady, Hannegan, Noble, Farmer, and another Detective, William Bradley, came to the courtroom in which defendant was to be arraigned and took seats together a couple of benches from the front of the courtroom. A Public Defender, who was appointed to represent the defendant, was in the courtroom but defendant first learned of this after he had been brought into the courtroom and approached the Bench to enter his plea. Nor had the Circuit Attorney's Office advised this court-appointed counsel for the defendant of the proposed confrontation between the defendant and his accusers. Three other men had been brought before the Court for arraignment and at least two of them were black men. When the defendant entered the courtroom, Charles Noble exclaimed: "Here comes Samuel Bradford now." Roady made no comment, but, according to Detective Farmer, Hannegan "implicated Bradford as being involved in the robbery." At the time Noble made his exclamation all of the witnesses and the of-

ficers were seated in close proximity to one another. Detectives Farmer and Bradley were the St. Louis police officers who had gone to Chicago and returned the defendant to St. Louis to face this charge. We can draw only one conclusion, and that is that both the victims, Noble, and the two detectives present at the arraignment knew that the defendant was under indictment at that time for this offense.

At the hearing on defendant's motion to suppress his confession the same two witnesses were presented as on his motion relative to the identification issue. There it was developed that the two detectives were sent to Chicago to bring defendant to St. Louis to face this charge for which he was on trial. While in custody in Chicago the defendant had consulted with a member of the Public Defender Bureau of Chicago and according to defendant, he was advised to come back to St. Louis, plead guilty, and throw himself on the mercy of the Court. The St. Louis detectives arrived in Chicago on Saturday, December 21, 1968, and took him into custody, returning him to St. Louis within five hours of the time they first saw him in Chicago. On their trip back to St. Louis they talked to him but not about the robbery. Upon arriving in St. Louis the defendant was taken to police headquarters and placed in a cell at the "Holdover," where, despite his request that he be given a cell mate because he did not like to stay alone, he was kept by himself. There the defendant remained until the following Monday morning, December 23, 1968, although on Sunday, the officers visited with him. According to the defendant he was willing to make a statement about the robbery upon his return—he having already given one to the Chicago police while in custody there—but the St. Louis police officers would not take his statement. On Monday morning the detectives came to his cell and he again told them he was willing to make a statement. Thereafter, about 10:30 a. m., an Assistant Circuit Attorney, accompanied by a secretary from that office, came to the offices of the Robbery Di-

vision of the police department and took verbatim from defendant the statement subsequently introduced into evidence as State's Exhibit No. 1. Defendant does not deny that he was given the Miranda warnings contained in this Exhibit, and admits that he had placed his signature at the end of the statement as well as his initials at other places in the statement. During his testimony in the hearing out of the presence of the jury, the defendant stated that he was neither abused nor threatened while in the custody of the St. Louis police department, but that he had heard that if you didn't talk there were certain things the police could do to you, and the fellow in the cell next to him would holler back and forth that he had been beaten up. This caused him some concern. He was not told that it would be to his advantage to make a statement at the time he did rather than at some later date, and although he was advised of his right to have a lawyer he stated that he said he didn't want one "at the present." He was not advised of the range of punishment for the charge he faced. He was of the impression that he had to say something and it would be to his advantage to make a statement although he had been told by the Assistant Circuit Attorney that he did not know if the Court would be lenient with him because of the fact he was so cooperative. There was no discussion as to what disposition would be made of his case.

Throughout the defendant's testimony during the trial in the presence of the jury and as a part of the defendant's case, defense counsel continually referred to Exhibit No. 1 as a confession, and the defendant said that the factors which entered into his giving the police this confession were: 1) the solitary confinement he was kept in from Saturday night to Monday morning, and 2) the chance that he would not be looked upon actually as a criminal, but as a person who had made a mistake.

At the conclusion of the pretrial hearing on each of the motions to suppress, the Court made a finding that the in-court identifications by witnesses Roady and Hannegan were not unnecessarily suggestive and conducive to an irreparable mistaken identification and that the statement sought to be suppressed was voluntary and given after he was fully advised of his constitutional rights.

Five days after the jury verdict in the trial, defendant filed in the Court what is denominated a "Motion for Clemency." Contained in this motion is the following:

"* * * Your honor, I have humbly admitted my mistake and have tried very hard to make right this mistake. I was holding a job working as a foreman when I was arrested. Your honor, I have always had a job and during the time I was involved in this particular incident I found I had a conscience and my conscience has gotten the best of me, time and time again for the misjustice I did to society. Throughout my whole trial I think you will find that the witnesses testified along the same lines in which I did, in my statements."

■ While we do not recommend the procedure employed here by the State in presenting the defendant to the witnesses on arraignment for identification purposes, whatever error might have been committed by the trial court in denying defendant's motion to suppress and overruling his objection at the trial to Roady's identification testimony was cured when the defendant took the stand in his own behalf and he did not disclaim the confession introduced into evidence in the State's case as Exhibit No. 1. This confession constituted a complete recitation of the defendant's participation in the robbery for which he was on trial from the time it was conceived, through the planning stage, its execution, his escape and subsequent arrest. He also, both on direct and cross-examination, made damaging admissions under oath in open Court which corroborated the facts testified to by the State's witnesses and developed in his statement or confession. He admitted his presence and participation in the robbery and therefore removed the is-

sue of identification from the trial altogether.

The Courts are ever solicitous of the misadventure of mistaken identification lest some innocent person be convicted on tainted testimony induced either knowingly or unwittingly by circumstances surrounding the confrontation of the victim with the suspect. However, where as here the defendant removes all question of identification from the trial, mere error in the admission of evidence during the course of the trial with respect to identification will not call for reversal of the conviction of the defendant on that ground alone. In Motes v. United States, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150, the Supreme Court of the United States said:

> "It would be trifling with the administration of the criminal law to award * * * (the accused) a new trial because of a particular error committed by the trial court, when in effect he has stated under oath that he was guilty of the charge preferred against him."

This Court has applied this same line of reasoning in the past in the following cases: State v. Ussery, 357 Mo. 414, 208 S.W.2d 245; State v. Brown, Mo., 404 S.W.2d 179; State v. Walker, Mo., 416 S.W.2d 134; State v. McGee, Mo., 447 S.W.2d 270. In State v. Eacret, Mo., 456 S.W.2d 324, we recently cited with approval the cases just mentioned and followed their legal reasoning in ruling on a similar point. In Eacret, the defendant, charged with Burglary in the Second Degree, took the stand and admitted under oath that he was guilty of the offense charged, the authenticity of the exhibits to whose introduction into evidence he had objected, and the truth of the statement of another implicating him in the crime. This Court there said, l. c. 328:

> "Applying the reasoning and result of McMann v. Richardson (397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763), a conviction after a counseled judicial admission of guilt cannot be challenged on appeal on the basis that the admission of guilt was

the consequence of some improperly admitted evidence or other trial error."

In addition to the defendant's statement introduced into evidence during the State's case, his failure to disclaim its authenticity or veracity, and certain damning admissions made during his own testimony at trial, we also have before us in the record his "Motion for Clemency" wherein he again admits his guilt of the offense for which he was convicted and which he now asks this Court to set aside. To heed defendant's plea in this regard would truly "be trifling with the administration of the criminal law" under the circumstances presented to us on this record.

■ What has been said heretofore with respect to the identification motion is equally applicable to the defendant's second contention relative to State's Exhibit No. 1— his confession. We can find no fault with the trial court's findings that this statement was made voluntarily after the defendant had been fully advised of his constitutional rights and had been given the Miranda warnings. Any error in this respect, were there one lurking in the recesses of the record, would not require a reversal of this conviction because of the defendant's in-court adoption of his statement as true and correct, as well as his other damaging statements made from the witness stand in open court that left no reasonable doubt in the mind of those present of his guilt of the offense for which he was then standing trial. Ussery, Brown, Walker, McGee and Eacret, supra, also dispose of this contention of the defendant and we must therefore rule this point against him.

And it further follows, as the night must the day, that the contention that the trial court erred in refusing to give defendant's proferred instruction on the issue of the voluntariness of defendant's confession must also be ruled against him. The defendant removed this issue from the trial in the same manner as he did the question of identification. Nevertheless, the Court did give an instruction which meets the stand-

ards of our law on this issue, even as we view the evidence most favorable to the defendant. State v. Stidham, Mo., 305 S.W. 2d 7. Defendant contends that there was evidence of mental duress or coercion and relies on State v. Williams, Mo., 369 S.W. 2d 408. It is our view that Williams presents a different set of circumstances than are present in this case to warrant the submission made there. The cases have a most important distinguishing fact situation; in Williams, supra, the defendant did not take the stand, adopt his confession and make damaging admissions in open court as defendant has done here. The defendant could not have been prejudiced by the giving of the instruction, nor the refusal of the Court to give the proffered instruction and we must therefore rule this contention adverse to the defendant.

Defendant's next point is that the Court erred in permitting the State to argue (1) that the robbery took place in a crowded hospital, and (2) that it would not introduce physical evidence consisting of a gun and a green bag because the defendant had them last since these arguments went outside the evidence and were contrary to facts known to the State or easily ascertainable by it. Defendant contends that the Court should have sustained his objections and granted appropriate relief.

■ The record on appeal contains only the State's closing argument and we do not therefore have the benefit of the defendant's argument. From a reading of that portion of the State's argument we are nonetheless able to discern that the defendant's first complaint arises from that portion of the Assistant Circuit Attorney's argument wherein he states that because the two cashiers entered the hospital armed with loaded weapons the commission of a robbery there made this an explosive situation in a crowded hospital. At this point in the argument, defense counsel interposed an objection that there was no evidence that the hospital was crowded. The Court overruled this objection by stating: "They

will be guided by the evidence. All right. You may proceed." Counsel for the defendant did not pursue his objection any further nor did he ask for any other relief. Under these circumstances we find no prejudicial error in the action taken by the Court. There was evidence before the jury that the reason the two cashiers were present in the hospital was for the purpose of cashing payroll checks for the employees of the hospital and they had with them the sum of Fifty Nine Thousand Three Hundred Twelve Dollars ($59,312.00) for that purpose. The trial judge has a broad discretion with regard to matters properly argued by counsel and we see no abuse of such discretion which would amount to prejudicial error.

■ The second part of the argument complained of is directed towards the response of the State to the defendant's argument directed to the failure of the State to produce at trial the guns and bags taken from Roady and Hannegan. As stated above, we do not have the defendant's argument before us, but we can deduce from that portion of the State's argument to which the objection was directed, that it was retaliatory in nature. The Assistant Circuit Attorney argued that the defense counsel during his argument commented that all the evidence the State had was the defendant's statement; that it did not have the guns nor the bags seized in the robbery. He proceeded to tell the jury that the reason the State did not have the missing guns or bags was because the last person to have them was the defendant. At this point defense counsel interposed an objection that this was contrary to the information available to the State. The Court overruled the objection. State's counsel requested that the objection of the defense counsel be stricken; this was sustained and the Court commented that this was proper argument. Defense counsel made no further explanation to the Court what the basis of his objection was, nor did he request any other relief. The State's attorney proceeded to repeat his argument

to the jury in this vein. Defendant preserved this point in his Motion for New Trial and at the same time filed a Request for Additions to the Record, wherein he requested that the trial court take notice of File No. 215Q, State v. Robert Hill. (Hill apparently is the same Hill referred to herein as one of the participants in this robbery with the defendant.) According to the defendant there was a transcript of oral proceedings held some twenty-five days prior to the commencement of this trial which "indicates that a Smith and Wesson gun was available to the State as evidence." He further contended that the Assistant Circuit Attorney who prosecuted his case and made this argument was the same one who handled the Hill case. We suppose that this point was made so that we could infer from the circumstances that the Assistant Circuit Attorney who made this argument knew at the time he did that there was a Smith and Wesson gun available to the State as evidence in this case, and he was therefore misleading the jury to the prejudice of the defendant. The transcript of the oral proceedings referred to as being contained in the file in the Hill case is not made a part of this record, nor is there any other evidence in the record to support this charge lodged against the prosecutor. However, if such a gun was available to the State and if defense counsel knew it at the time he made his argument he is in no better position than State's counsel in relation to this retaliatory argument. There was no evidence that the gun the defendant contends the State had available to it could have been admissible against this defendant at his trial, and therefore we must rule this contention against the defendant.

■ Defendant's fifth point is that the Court erred in refusing him relief on the ground that the State exhausted its peremptory challenges to exclude all Negroes from the jury before which he was tried. It is not clear from the record how many Negroes were included in the original panel of thirty-four jurors brought to the court-room for the voir dire examination of the jury. However, the State exercised ten peremptory challenges and the defendant twelve. There is nothing in the record to indicate that any of the prospective jurors was challenged for cause. However, we may assume that the defendant was tried by an all white jury. There was no objection made to the make-up of the jury until defendant was brought before the trial court for allocution and sentencing. At that time the defendant proffered to his counsel for presentation to the Court a three-page text prepared pro se, charging that he had been deprived of an impartial jury since he, a Negro, was tried before an all white jury and that all of the members of his race on the panel had been removed by the State by use of its peremptory challenges. While we could refuse to review this point because of the manner and time of its presentation to the trial court, we would invite to the attention of the defendant Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, where this same point was ruled on by the Supreme Court of the United States adversely to the defendant's position. We have recently passed on the constitutionality of our statute, Sec. 546.180, RSMo 1959, V.A.M.S. and upheld it following the principles laid out in Swain, supra. State v. Davison, Mo., 457 S.W.2d 674. We therefore rule this point against defendant.

■■ Defendant's sixth and final point is that it was error for the trial court to submit the case to the jury because the State failed to prove that the alleged robbery occurred in the City of St. Louis, Missouri. A study of the transcript does reveal that there is no specific reference made to the location of the robbery as being within the city limits of the City of St. Louis; however, venue need not be proved beyond a reasonable doubt but may be sufficiently established "if the jury reasonably could have found from the facts and circumstances in evidence that the alleged crime occurred in that county." State v. Haun, Mo., 324 S.W.2d 679; State v.

Garrett, Mo., 416 S.W.2d 116. As early as 1883 the St. Louis Court of Appeals, in State v. Ruth, 14 Mo.App. 226, held that a conviction could stand where the record described the scene with reference to "old, established, well-known streets" in the City of St. Louis. Jewish Hospital, the scene of the robbery, is a well-known landmark in the City of St. Louis and Parkview (the street from which the victims of the robbery entered the hospital) and Newstead (the street from which the defendant and one of his cohorts entered the hospital to carry out the robbery and from whence they fled in the getaway car) are both "old, established, well-known streets" within the City of St. Louis. We hold therefore, that there were sufficient facts and circumstances in evidence from which the jury could reasonably find that the crime charged and of which the defendant was convicted occurred within the City of St. Louis, Missouri, and we therefore rule this point against the defendant.

The judgment is affirmed.

All of the Judges concur.