STATE of Missouri, Respondent,

v.

Walter VALENTINE, Appellant.

No. 57613.

Supreme Court of Missouri,
Division No. 2.

Feb. 11, 1974.

Motion for Rehearing or for Transfer
to Court en Banc Denied
March 11, 1974.

John C. Danforth, Atty. Gen., Richard S. Paden, Asst. Atty. Gen., Jefferson City, for respondent.

James E. Hullverson, St. Louis, for appellant.

HENLEY, Presiding Judge.

Walter Valentine, defendant, has appealed [1] from a judgment sentencing him to imprisonment for life on his conviction of first degree murder on November 4, 1971. We affirm.

Defendant was charged by indictment with intentionally and deliberately killing Floyd Jordan by shooting him with a pistol on January 19, 1971, in the city of St. Louis, Missouri. His pleas were not guilty and not guilty by reason of mental disease or defect excluding responsibility. A jury found him guilty and assessed his punishment at life imprisonment.

The questions raised on this appeal involve (1) the sufficiency of the evidence to show that the person killed was in fact Floyd Jordan; (2) the admissibility of evidence of identity of a body as that of Floyd Jordan; (3) the sufficiency of the evidence to prove venue in the city of St. Louis; and (4) the action of the trial court in giving two instructions.

The evidence would warrant the jury in finding the facts to be as follows. In the late afternoon or early evening of January 19, 1971, approximately three months after having been released from the state penitentiary, defendant hailed a Marcella taxicab driven by Floyd Jordan at Union and St. Louis avenue, in the city of St. Louis, got in the front seat with the driver and told him to take him to St. Louis and Marcus. Enroute to that destination, defendant, with a .32 automatic pistol in his hand, ordered the driver to turn north off St. Louis onto Euclid avenue. They drove north on Euclid to Ashland street and then east on Ashland to an alley in the 4700 block of Greer avenue, where defendant directed the driver to stop, turn off the car lights, and hand over his money. The driver did so, giving defendant about $40. Defendant, apprehensive that the driver could recognize him, took him through a gangway into a garage on the alley at the rear of 4725 Greer, told him to lie down, and when he did defendant held the pistol to the driver's head and fired at least twice. Jordan died almost immediately.

Officer Hugh Geiler and his supervisor, Sergeant Edward Jones, both St. Louis city police officers assigned to the Eighth district, were the first officers to arrive at the scene and begin an investigation. Officer Geiler testified that he found a Marcella taxicab belonging to Floyd Jordan abandoned in an alley in the 4700 block of Greer avenue; that he and Sergeant Jones made a search of the area for the driver and found him in a garage adjoining the alley. Sergeant Jones testified that he arrived at the scene at about 6:30 p. m. on January 19, 1971, in response to a report of an abandoned taxicab in that area; that "some people indicated that a fellow had taken the cab driver down the alley and that they later heard some shots"; that while searching for the taxi driver he looked in a "garage door * * * in the rear of 4725 Greer * * * and there was a fellow laying there on an old bed spring * * * bleeding about the head and he was unconscious"; that he then called for the homicide squad and a conveyance for the body.

---

1. Notice of appeal was filed before January 1, 1972, and we retain jurisdiction to decide the case as required by the schedule (§ 31, para. 4) to the 1970 amendment of Art. V, § 3, Constitution of Missouri, V.A.M.S.

Officer Geiler further testified on direct examination, and defendant made objections, as follows:

"Q. Did you at any time that evening see Floyd Jordan?

A. Yes.

Q. Where did you see him?

A. I saw him on a stretcher.

MR. HULLVERSON: I'll object to that as a conclusion, if the court please.

THE COURT: Overruled.

Q. (By Mr. McDonald) Where did you see him?

A. I saw him on a stretcher.

Q. Where was this stretcher located?

A. He was being taken out of a garage in the rear of 4700 Greer, on a stretcher, put in a cruiser.

MR. HULLVERSON: I'll object to these answers in this line, as a conclusion, based on hearsay, if the Court please, and ask it be stricken and the jury be instructed to disregard it and a mistrial declared.

THE COURT: Overruled. Overruled as to mistrial."

Defendant did not cross-examine the officer.

Dr. James R. Criscione, a medical doctor engaged in private practice in St. Louis, testified that as a physician for the city coroner he performed an autopsy on January 20, 1971, on the body of Floyd Jordan, whom he described as a colored male, fifty-nine years old, sixty-eight inches tall and weighing 160 pounds; that he found two gunshot wounds in Jordan's neck which had severed his spinal cord and produced death. Defendant made no objection to any of this testimony and did not cross-examine the witness.

Detective Herbert Riley testified that he was a member of the St. Louis Police Department assigned to its homicide division; that he investigated the shooting and killing of Floyd Jordan; that in the course of his investigation he visited the scene of the shooting in a small vacant building on an alley that ran through the 4700 block of Greer avenue and looked in that area for witnesses to the shooting; that he talked with defendant shortly after his apprehension on February 4, 1971, in the city of St. Louis; that he advised defendant of his rights; that defendant understood his rights and did not want an attorney; that defendant made a statement to him regarding the homicide. This statement, as narrated by the officer, is as follows:

"He then went on and stated that sometime, in the middle of January, he couldn't remember the exact date, it was just about the time that it was getting dark, he said that he was standing on the corner of Union and St. Louis when this taxicab stopped at the red light. While the cab was stopped, Valentine said he got into the front seat with the driver. He said he directed the driver to take him to St. Louis and Marcus. He said enroute to this location, Valentine said he pulled a .32 automatic from his waist band, pointed it at the driver, and told the driver to turn north on Euclid from St. Louis. He says then they drove north on Euclid to Ashland. He said then he directed the driver to drive east on Ashland to an alley. He said he then told the driver to go up the alley. He said when they drove up the alley for some distance, he told the driver to turn off the car, turn out the lights. He said he then told the driver to hand him his money, and not to look at him. He said the driver then gave him about $40, most of which was in change. He says that he then told the driver to slide out of the driver's side, and as the driver was doing this the driver kept trying to look back to see what he looked like. He said he told the driver not to look back. As the driver got outside the door Valentine said he slid out behind the steering wheel the same way the driver went out. He says as they both got out, the driver tried to

break away and run. Valentine said he grabbed him by the collar of his shirt or coat. He said he said to the driver, 'Don't do that.' He said he then marched the driver, or walked the driver down to the alley. He said he didn't know what he was going to do with him at that time, whether he should kill him or what. He said he walked down the alley for some distance, until he got to a gangway between a fence and a garage. He said he then led the driver into this gangway, he says as they started into the gangway the driver again tried to run away. Said that he had to grab the driver by the neck. He said he held him by the neck, he forced him into this little pedestrian door on the side of the garage. He said when he got into the garage he told the driver to lay down, and when the driver laid down Valentine says he took this .32 automatic and put it up to the driver's head and fired one shot, he said, but the gun went off three times. Valentine then said he ran back out of the gangway to the alley, then up to the alley and back to the cab. He says when he got to the cab he tried to start the cab, but it wouldn't start, so he removed the keys, got out of the cab, ran through a gangway and while doing this he threw the keys into a trash can. He says he then got onto Greer avenue, and then left the scene."

Detective Riley also testified that defendant further stated that the weapon he had used in this shooting is one he had taken from the home of his girl friend, Joyce O'Neal, while she was not looking; that after the weapon was recovered through the help of Miss O'Neal, it was shown to defendant and he "identified it as the same weapon he had used in the shooting." Miss O'Neal testified that she had resided at 4320 Cintra, in St. Louis nine or ten years; that she knew and had dated defendant for the last seven years; that she was with him at the Carousel Motor Hotel on Kingshighway when he was arrested on February 4, 1971; that defendant called her on the telephone, as a result of which she helped the police find the weapon which had been hidden

in some bushes near DeAndreis High School.

There was also evidence from a ballistics expert that a spent bullet and .32 caliber shells found at the scene of the homicide had been fired by the pistol identified by defendant as the one he had used to shoot the cab driver.

In the first point briefed defendant contends that the state did not make a submissible case in that it failed to prove one element of the corpus delicti, i. e., the death of the person alleged to have been murdered. Conceding that he admitted murdering a Floyd Jordan, defendant argues that there is no evidence the Floyd Jordan killed by him is (1) the same person named in the indictment as having been killed by him, or (2) the same person found in the garage building behind 4725 Greer street, suffering from fatal gunshot wounds.

In connection with this point defendant asserts that the closest the state came to making the necessary proof was through the testimony of Officer Geiler that during the evening of July 19, 1971, he saw Floyd Jordan on a stretcher as he was being taken out of the garage building and placed in a police cruiser in the alley where Jordan's taxicab had been found. He contends that this identifying testimony was inadmissible, because it was a "bare conclusion" and hearsay, and its admission over his objection reversible error.

■ Assuming, for the purpose of discussion, that defendant's objection to this part of the officer's testimony was timely, there is no merit to his contention that the court erred in overruling his objection, because evidence of the name by which a person is known is not within the rule excluding hearsay. State v. Pitchford, 324 S.W.2d 684, 688[5] (Mo.1959). Nor is it a conclusion since the witness's answer is presumably based on knowledge, even though it be a knowledge acquired through hearsay. State v. Deppe, 286 S.W.2d 776, 781[8] (Mo.1956).

The evidence is that defendant admitted he rode in a taxicab to the alley mentioned in the evidence and shot and killed the driver, a Floyd Jordan, in a garage building adjoining the alley. Officer Geiler identified a taxicab found in the alley as belonging to Floyd Jordan, and the person suffering from gunshot wounds when brought out of the garage on a stretcher as Floyd Jordan. Dr. Criscione testified that he performed an autopsy upon the body of Floyd Jordan and found two gunshot wounds in the neck which produced death. In addition to this testimony, there was evidence that a spent bullet and shells found at the scene where Floyd Jordan was shot were fired by the pistol which defendant admitted he used to shoot the cab driver. This is sufficient evidence of the death of the person alleged to have been murdered and sufficient evidence to identify the person charged to have been murdered by defendant as the Floyd Jordan he admitted killing and the Floyd Jordan whose body was found in the garage. State v. Hale, 371 S.W.2d 249, 252[2] (Mo.1963).

Defendant next contends that the state failed to prove that the offense charged occurred in the state of Missouri or the city of St. Louis. In other words, defendant says the state failed to prove venue.

In State v. Garrett, 416 S.W.2d 116, 118–119[2–5] (Mo.1967), the court said: "[V]enue must 'be proved because the accused, under the Sixth Amendment to the Constitution, is guaranteed the right to a public trial by an impartial jury of the state and district wherein the crime shall have been committed.' Dean v. United States (CA8), 246 F.2d 335, 338. See also Art. 1, § 18(a), Mo. Constitution, V.A.M.S., providing for a trial by an impartial jury of the county; and § 541.030, RSMo 1959, V.A.M.S. to the same effect. But as indicated in Dean, supra, and in various other cases, venue is not an integral part of a criminal offense and need not be proven beyond a reasonable doubt or by direct evidence, but it may be inferred from all the evidence. In the following Missouri cases it was held directly that the venue might properly be found by the jury from circumstantial evidence. State v. Kenyon, 343 Mo. 1168, 126 S.W.2d 245; State v. Gow, 235 Mo. 307, 138 S.W. 648; State v. Ruckman, Mo., 222 S.W.2d 74; State v. Hartwell, Mo., 293 S.W.2d 313; State v. Cobb, 359 Mo. 373, 221 S.W.2d 745; State v. Haun, Mo., 324 S.W.2d 679; State v. Heissler, Mo., 324 S.W.2d 714. As stated in Haun, supra, the venue was sufficiently proved 'if the jury reasonably could have found from facts and circumstances in evidence that the alleged crime occurred in that county'; and, as stated in Heissler, supra, in a slightly different form, the evidence is sufficient if the facts and circumstances 'reasonably support the inference that the offense was committed in Greene County.'" See also State v. Bradford, 462 S.W.2d 664, 671–672[6, 7] (Mo.1971).

There is no direct evidence that this homicide was committed in the city of St. Louis, Missouri, but there is circumstantial evidence from which the jury reasonably could find that the homicide occurred in the city. On the question of whether the city is in the state of Missouri, judicial notice may be taken that it is. State v. Sockel, 485 S.W.2d 393, 394[1] (Mo.1972). Seven police officers who were engaged in one or more phases of the investigation of the shooting of Floyd Jordan identified themselves as officers of the police department of the city of St. Louis. The intersection of St. Louis avenue with Union boulevard, where defendant hailed the Marcella taxicab driven by the deceased, Jordan, as well as the intersection of St. Louis with Marcus, the point to which defendant asked to be taken, the intersection of St. Louis with Euclid avenue where they turned north onto Euclid, and Ashland avenue, over which they traveled enroute to the alley in the 4700 block of Greer avenue, are all old, established, well-known streets and intersections in the city of St. Louis. From these facts and circumstances the jury reasonably could find,

as it did, that defendant killed Floyd Jordan in the city of St. Louis, Missouri. State v. Bradford, supra.

The evidence is sufficient to sustain the conviction.

Defendant's next point is that the court erred in giving instruction No. 4 submitting the defense of mental disease or defect excluding responsibility for the alleged offense. The identical instruction, with the exception of the description of the offense charged, was given and may be found in State v. Duisen, 428 S.W.2d 169, at l.c. 174 (Mo. banc 1967).

█ Defendant asserts and complains that in advising the jury that it was for the jury alone to determine whether "defendant was incapable of conforming his conduct to the requirements of the law" the jury was invited and compelled to surmise, guess and speculate as to what these "requirements" are and what is meant by "requirements of the law." He asserts that an instruction should have been given defining this phrase and argues that without a definition it was impossible for the jury to determine whether he could have so conformed his conduct. The instruction follows faithfully the requirements of § 552.030[2] and the quoted phrase is taken from that section. The phrase requires no definition; nor does it permit the jury to surmise, guess, or speculate as to what the law requires, because, when read with the other instructions given, it would be perfectly clear to any reasonable man that the "requirements" to which defendant was bound to conform his "conduct" in this case were that he not kill Floyd Jordan. The point is without merit. We note that MAI–CR 2.33 recently approved and required to be used in criminal cases effective January 1, 1974, contains in paragraph second the same phrase to which defendant objects. No definition of this phrase is required in MAI–CR, obviously because when MAI–CR 2.33 is used with other proper approved instructions, particularly

MAI–CR 2.30 or 2.04, the "requirements" are stated.

Defendant's last point is that the court erred in giving instruction No. 2. He contends that there are two fatal flaws in this instruction. First, that the instruction failed to inform the jury of the full extent of defendant's plea, in that it told the jury only that "he pleads not guilty," whereas it should have told the jury "he pleads not guilty by reason of mental illness or defect." Second, that by stating "*he* pleads not guilty" it is suggested to the jury the defendant personally entered this plea, and that the court considered him rational and clear enough mentally to enter a plea on behalf of himself, otherwise the court would not have accepted the plea from him. Defendant cites no authority in support of his position. The state cites State v. McCann, 329 Mo. 748, 47 S.W.2d 95, 101[21] (Mo.1932), where the complaint made was that the instruction improperly told the jury that the defense of "[i]nsanity is interposed by counsel for defendant * * *." The court reversed and remanded for other reasons, but suggested that upon retrial the expression "by defendant's counsel" should be eliminated. Our research has produced no other authority.

█ As to the charged first flaw, the proper pleas were both "not guilty" *and* "not guilty by reason of mental disease or defect excluding responsibility." The instructions given correctly informed the jury that both pleas were entered. Instruction 2 told the jury defendant's plea was "not guilty." Instruction 4 told the jury that another defense was that defendant is "not guilty by reason of mental disease or defect excluding responsibility."

█ As to the charged second flaw, we consider the argument tenuous at best. We do not consider that a jury of reasonable men would reach the conclusion defendant suggests, but, assuming for the purpose of discussion that it did so conclude,

2. References to sections of statutes are to RSMo 1969 and V.A.M.S.

the conclusion would be that *at the time of the plea* he was mentally rational and clear; not that he did not have a mental disease or defect *at the time of the alleged offense* some several months before. The issue here was whether the defendant had a mental disease or defect excluding responsibility at the time of the shooting, not whether he was so afflicted at the time of the plea. The court did not err in giving instruction 2.

The judgment is affirmed.

All of the Judges concur.