STATE of Missouri, Respondent,

v.

Walter HARVEY, Appellant.

No. 51181.

Missouri Court of Appeals,
Eastern District,
Division Three.

April 28, 1987.

Motion for Rehearing and/or Transfer
Denied June 2, 1987.

David C. Hemingway, St. Louis, for appellant.

William L. Webster, Atty. Gen., Donna Richards-Crosswhite, Asst. Atty. Gen., Jefferson City, for respondent.

KAROHL, Judge.

This case involves two related tragedies. The first is the kidnapping, sexual assault and brutal murder of two wholly innocent and fine young people, a married couple, on December 14, 1982. The second is the deliberate, deceptive and dastardly acts of unexcusable misconduct by two jurors, which conduct deserves the reproach of all right thinking citizens. Their acts possibly constitute a sabotage of the trial of defendant who stood charged with two counts of capital murder. Section 565.001 RSMo 1978. Their acts do constitute an affront to the criminal justice system on which every citizen must rely. The direct appeal is properly before this court because defendant appeals from consecutive sentences of life, minimum of 50 years on each charge.

Two jurors admitted in testimony during a hearing on defendant's motion for new trial that they were repeatedly admonished during trial by MAI–CR 2d 1.08 not to "view or listen to any newspaper, radio, or television report of the trial." On the evening of the second day of the trial they intentionally [and while fully cognizant of their wrongdoing] reconnected the combination radio-TV in the motel room furnished by the state while they were sequestered during the trial. Proper authorities

had carefully disconnected the television set before the trial. Juror Theodore Aldrich and Juror James Robinson discussed their plan to reconnect the TV set. Juror Robinson stripped the wires which were inserted into the electrical system. On two occasions they heard a television newscast which offered information on the trial. Juror Aldrich recalled the first newscast on the evening of the second day of trial and that they watched the 10 o'clock newscast on local Channel 5. He also recalled that he saw defendant in the custody of bailiffs and that the case was being retried because of a mistrial. Aldrich testified that after the first news broadcast he had a discussion with Mr. Robinson noting the newscast referred to the trial they were sitting on. Juror Robinson commented that the report was of the trial in which they were participating.

Juror Robinson testified that they viewed the TV five or six times and on the first occasion the newscast reported a retrial; that he did not hear a description of mistrial; and *he could not remember the words that he did hear.* Robinson also testified they mostly listened to the radio. Both jurors admitted they knew their conduct was wrong during the commission of their acts and they did not report the acts to anyone during the trial. Both denied their access to media had any influence on their deliberations during the guilt or innocence phase of the trial. Both acknowledged that after the finding of guilt on both charges was returned to the court and before the hearing on the penalty phase commenced they listened to a second TV newscast reporting their verdict.

The extent of this tragedy involving juror misconduct is fully cognizable only by considering other background facts. First, the extent of the investigation of law enforcement authorities in both Missouri and Illinois involved a massive application of time and resources. Missouri authorities were involved because the original abduction occurred in St. Louis County, the murder of Gary Decker occurred in Missouri and the sexual assault and murder of Donna Decker occurred in Illinois. Missouri law enforcement authorities, Illinois law enforcement authorities, Federal prosecutors and the Federal Bureau of Investigation authorities were involved in the investigation, preservation of evidence, preparation for prosecution and trial of the defendant on three occasions and for the co-defendant on two occasions.

Second, the effort and expense of prosecuting authorities, federal and state, were utilized in four trials including the present trial. Defendant and a co-defendant were tried in April, 1983, in the Federal District Court for kidnapping, transportation of a stolen vehicle across state lines, interstate transportation of a female for immoral purposes, and unlawful use of a firearm. They were found guilty and each was sentenced to serve a combined term of 120 years. These convictions were affirmed in *U.S. v. Harvey*, 756 F.2d 636 (8th Cir.1985). Raphael Clark was tried and convicted for the capital murder of Gary Decker and sentenced to life imprisonment without probation or parole for at least 50 years. This conviction was affirmed by this court in *State v. Clark*, 711 S.W.2d 928 (Mo.App. 1986). Defendant was tried and convicted for the murder of Gary Decker and sentenced to death. This conviction was reversed and remanded by the Supreme Court solely on the ground that defendant's lawyer in the first trial did not participate thereby depriving defendant of a constitutional right to a fair trial. *State v. Harvey*, 692 S.W.2d 290 (Mo. banc 1985). No mistrial has ever occurred involving the defendant or during the prosecution of any charges relating to the present facts.

Third, because of the background and without objection the trial court in the present case secured a jury from a venire panel in Kansas City, Missouri. The jurors were transported to St. Louis County where they performed their function. As a result, all of the jurors, including Robinson and Aldrich, were aware that the trial was unusual. This fact alone is relevant and accentuates the claim of misconduct. It is also relevant in considering the expenditure of time and cost, measured both in dollars and inconvenience to all of the many persons involved. These considerations only

serve to accentuate and emphasize the extent or effect of the admitted misconduct.

Fourth, the misconduct occurred during the early stages of the trial and before the case was submitted to the jury. However, because the jurors did not report that they had listened to the television newscast relating to the trial and their conversation or comment about it or their listening to the radio during the trial, their misconduct affected, or may have affected, the course of the trial and their deliberations. This is significant because the legal rules involving juror misconduct relating to unauthorized communications are divisible into those cases involving communications before submission and after submission.

Fifth, the fact of misconduct was disclosed after trial when Juror Aldrich informed deputy sheriff Fred Sher that he and Robinson had listened to two TV newscasts about the trial. Sher testified that Aldrich reported learning of a mistrial from the first TV program. To his considerable credit Sher informed the court who in turned informed counsel of the facts.

Lastly, during the hearing on the motion for new trial and after Juror Aldrich identified the first newscast to be the 10 o'clock news on Channel 5, counsel for the defendant requested the court to continue the hearing and require the video tape to be produced for viewing. This motion was repeated on three occasions, but never ruled by the trial court. It is not known whether the TV tape exists. We also note that both jurors testified to listening to the radio, however, no questions were asked either by the state or by the defense about what the jurors may have heard or learned about the trial from the radio broadcasts.

Section 547.020 RSMo 1978 provides: "The court may grant a new trial for the following causes, or any of them: ... (2) when the jury has been separated without leave of the court, after retiring to deliberate upon their verdict, *or* has been guilty of any misconduct tending to prevent a fair and due consideration of the case; ...." (emphasis ours) Our Supreme Court in *State v. Jones*, 363 Mo. 998, 255 S.W.2d 801, 805–806 (1953) reversed a conviction

involving juror misconduct similar to the case before this court. Relying on this statute and others the court said,

> We have said, since the enactment of the above statutes [546.230, 546.240, 547.020] especially the latter two, that if the separation or misconduct of the jury takes place during the progress of a felony trial, the verdict will be set aside, *unless the state affirmatively shows that the jurors were not subject to improper influences;* and that if the separation or misconduct occurs after the retirement of the jury for deliberation and prior to reaching a verdict, *defendant is entitled to a new trial even though it be established that defendant was not actually prejudiced.* (emphasis ours)

*Id.* at 806. In the *Jones* case after the evidence had been completed and during the jury instruction conference, a witness who gave material testimony against the defendant was seen conversing with a juror. Defendant's motion for mistrial based on juror misconduct was denied. The court, citing *Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917, 921 (1892) and other federal and state authorities, applied the principle, "private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox,* 146 U.S. at 150, 13 S.Ct. at 53. In *Mattox,* the state made no showing whatsoever of harmlessness to rebut the presumption of prejudice.

The case of *State v. Edmondson*, 461 S.W.2d 713 (Mo.1971) is also instructive for several reasons. In *Edmondson*, defendant sought a new trial based on juror misconduct on a matter first raised in the motion for new trial. The claim was that a juror had discussed the merits of the case prior to submission with a witness. The court held a testimonial hearing on the issue. The juror admitted talking to a witness about the case at the Sands Cocktail Lounge. However, the witness was a defense witness and testified favorably to the defendant and the juror obtained only in-

formation concerning defendant's past which included information that the sheriff's office had unjustly harassed the defendant for minor mischief. The court began its analysis with § 547.020 RSMo 1969. The court quoted *State v. Jones*, for the controlling rule and appears to recognize juror separation or misconduct *after* submission is sufficient in itself to require a new trial, but misconduct before submission imposes a presumption of prejudice which requires a verdict to be set aside "unless the state affirmatively shows that the jurors were not subject to improper influences." *State v. Edmondson*, 461 S.W.2d at 723. The court concluded the trial court had *fully* heard the matter and the presumption of prejudice was overcome by the fact that the juror was on defendant's side and that no prejudice could have developed from the improper conversations. In effect no improper influence from the misconduct could have been a factor during deliberations which was adverse, therefore prejudicial, to defendant.

We find in the present case the trial court did not fully develop the evidence relating to defendant's claim of juror misconduct which was first raised in the motion for new trial. Under the circumstances it would not have been prudent for defense counsel to have interviewed jurors Aldrich or Robinson before the hearing on defendant's motion for new trial. Likewise it would not have been prudent for the prosecuting attorney to have interviewed the witnesses. Accordingly, the identity of the television newscast by date, time and channel was first learned during the hearing. Defendant promptly requested the court to continue the hearing to require a tape of the program to be presented and considered. This request was made on three occasions, however, no ruling was ever rendered by the court. The request was opposed by the state. Because it has the affirmative burden to prove the jurors were not subjected to improper influences this position is short-sighted. We view the holding in *Edmondson* to be that "subject to improper influences" means no prejudice occurred. It does *not* mean that no event which might be prejudicial occurred. The

trial court did not have the benefit of the TV tape. Because it was a television communication the words alone, barely and inconsistently remembered by Aldrich and Robinson, do not permit a determination of the absence of prejudice.

■ The meaning of "mistrial", which never occurred, or the meaning of retrial and the reasons for retrial, if stated, are clearly relevant to whether or not prejudice occurred. Furthermore, both jurors admitted violating MAI–CR 2d 1.08 by listening to the radio on numerous occasions and there is no evidence whatsoever that this violation of the court's oft repeated instruction during the course of the trial was not prejudicial. Finally, the self-serving testimony of the jurors that the product of their misconduct was not prejudicial is not probative on the issue or decisive. *State v. Malone*, 333 Mo. 594, 62 S.W.2d 909, 915 (1933).

■ On the present record there was an admitted violation of MAI–CR 1.08 by two jurors. Under the applicable rule of law announced in *State v. Jones*, a remand for new trial would be justified. However, given the aforementioned circumstances and in light of defendant's request for production of the television tape we look to a procedure adopted by the Supreme Court in *State v. Murray*, 445 S.W.2d 296 (Mo.1969). In *Murray*, the court considered a matter which was developed during trial. The claim of juror misconduct involved the permitted separation of a juror at a recess of the court during the trial of the case. At a hearing held in connection with defendant's motion for new trial, appellant made a prima facie case showing a violation of § 546.230 RSMo 1959. We recognize this is a different statute than the statute presently under consideration and that it does not, by its terms, apply to capital cases such as the present appeal. However, on the issue of juror misconduct the burden under either statute is on the state to affirmatively show that jurors were not improperly influenced. The Supreme Court found the state had failed to meet its burden in *Murray* and issued an order for a hearing on the question in the trial court.

A hearing was held and a full transcript certified to the Supreme Court. After reviewing the transcript the Supreme Court agreed with the finding of the trial court that the jurors were not improperly influenced. The conviction on the charge of first degree robbery was affirmed.

We believe that a similar procedure as utilized in *State v. Murray* is appropriate in the present case. A review of the extensive background and circumstances in which this case was tried warrants an expeditious determination of the serious challenge to the juror's admitted misconduct. A full determination by the trial court subject to further review by this court would be of benefit to all parties. Accordingly, following the procedure utilized in *State v. Murray*, we remand this case to the trial court for further proceedings. On remand the trial court is ordered to conduct a further evidentiary hearing for the purpose of determining whether defendant's constitutional rights to a fair trial, and his rights secured by § 547.020 RSMo 1978, were violated by juror misconduct. The state and the defendant should be offered an opportunity to present the identified video tape of the television newscast viewed by jurors Aldrich and Robinson, if available.[1] The effect of the violation of MAI–CR 2d 1.08 in regard to listening to radio broadcasts should also be developed. After a full hearing the court may reconsider defendant's motion for new trial on the ground of juror misconduct in light of the legal authorities, and if it becomes necessary, certify to this court a full record of the hearing. We realize that this may represent an inconvenience to jurors Robinson and Aldrich, but this is insignificant in comparison to their imposition on the state and the defendant, all of the law enforcement authorities, all of the state and defendant witnesses, and all others similarly involved. We express no opinion on the findings or ruling of the trial court on this issue, but note the relevant law set forth in this opinion.

One other matter remains ripe for our immediate consideration on the appeal and before remand. The defendant was originally tried for the capital murder of Gary Decker. After the Supreme Court remanded for new trial, the state added the capital murder of Donna Decker as a second charge. The defendant, pre-trial and during trial, on all occasions contested the jurisdiction of a Missouri court over that murder. Defendant has properly preserved that issue before this court.

The relevant indictment charges defendant in violation of § 565.001 RSMo 1978, acting with another, in St. Louis County, Missouri, committed the felony of capital murder in that defendant acted with another in the County of St. Louis, State of Missouri, willfully, knowingly, with premeditation, deliberately and unlawfully to cause the death of Donna Marie Decker by shooting her on the evening of December 14, 1982, thereby causing her to die; *"said crime occurred in the County of St. Louis, State of Missouri."* (Our emphasis) Section 565.001 RSMo 1978, defined capital murder as follows: "Any person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder."[2]

The elements of the crime are premeditation and an act causing death. There is no dispute that Donna Decker was alive when taken to Illinois and there shot and killed. Defendant argues the only jurisdiction for the crime of murdering Donna Decker lies in the State of Illinois. The state responds that the kidnapping was done in St. Louis County and at the time of the kidnapping defendant and another intended to commit the murder somewhere. The state's posi-

---

1. In *State v. Williams,* 577 S.W.2d 59, 62 (Mo. App.1978) a juror was observed reading a newspaper during the giving of testimony. The court was fully aware of the events complained of and was quick to take corrective action which included a post-trial hearing and an examination of the media content.

2. This section was repealed in 1983 and replaced by new § 565.020.1 RSMo Cum.Supp. 1984 which now defines first degree murder to occur when, "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter."

tion is that one of the elements of the crime occurred in St. Louis County, Missouri, and therefore, St. Louis County has concurrent jurisdiction with the state in which the murder occurred.

In 1982, Missouri did not have, and does not now have a general jurisdiction statute covering homicide. The state relies on venue statute § 541.033 RSMo 1978, which authorizes a trial in any county where any element of the offense occurred. Section 541.033(2) RSMo 1978. It argues that capital murder includes: (1) intent to kill, (2) a knowing killing, and (3) premeditation and deliberation. *State v. Garrett*, 627 S.W.2d 635, 637 (Mo. banc 1982). It claims and the evidence supports a finding that elements one and three, intent and premeditation, existed at the time of the kidnapping of Donna Decker in St. Louis County. The state then argues on the authority of a kidnapping case, *State v. McGee*, 336 Mo. 1082, 83 S.W.2d 98 (1935) and a concubinage case, *State v. Johnson*, 115 Mo. 480, 22 S.W. 463, 464–465 (1893), that proof of one element of the crime in a Missouri county confers jurisdiction in Missouri. Further, it relies on an opinion of the Indiana Supreme Court in *Conrad v. State*, 262 Ind. 446, 317 N.E.2d 789 (1974), a homicide prosecution, in a state without a general jurisdiction statute governing crimes. The facts there supported a finding that a kidnapping and assault occurred in Indiana and the fatal blow resulting in death occurred in Ohio. Finally, the state relies upon an argument that the common law in Missouri soundly provides for prosecution wherever an essential element of the crime occurs in Missouri and that the Supreme Court of Missouri followed the common law in *State v. Garrison*, 147 Mo. 548, 49 S.W. 508, 510 (1898).

█ We find no help for the state in either the common law or in the Indiana case of *Conrad v. State*. "The general rule, both at common law and under statutes declaratory thereof, is that a homicide is committed in the state where the fatal wound or blow was given and, accordingly, that the courts of that state alone have jurisdiction to try the slayer for murder or

manslaughter and to punish him.... The crime is complete in the jurisdiction in which the act which causes death is done...." 40 Am.Jur.2d *Homicide* § 198 at p. 478. The *Conrad* case involves a kidnapping which occurred in the State of Indiana, but the final and fatal blows may have been inflicted in another state resulting in death in another jurisdiction. Moreover, the Indiana Supreme Court noted that the trial court was aware of the potential of lack of jurisdiction and instructed the jury to acquit if it found that the blows were inflicted in Ohio. The state's evidence in the present case is that the shooting occurred in Illinois. Further, the common law in Missouri is that a homicide takes place where the killing blow is inflicted. *State v. Blunt*, 110 Mo. 322, 19 S.W. 650, 654 (1892); *State v. May*, 42 Mo. 135, 151, 43 S.W. 637, 641 (1897). The defendant has a Sixth Amendment right to a public trial by an impartial jury of the state and district wherein the crime shall have been committed. *State v. Valentine*, 506 S.W.2d 406, 410 (Mo.1974).

█ No case has been cited to this court that determines the jurisdictional issue for homicide cases. The state relies on *State v. McGee*, 336 Mo. 1082, 83 S.W.2d 98, 109–110 (1935). State's reliance on *McGee*, is misplaced. In *McGee*, the Missouri Supreme Court held that the Circuit Court of Jackson County had jurisdiction in a kidnapping prosecution when the abduction took place in Jackson County, Missouri, not withstanding that the kidnapped person was confined in Kansas. In arriving at this conclusion, the court in *McGee*, analyzed the precise language in the statute which makes it an offense to abduct a person and secretly confine him "or" demand ransom for his release. The court found that jurisdiction was proper by establishing that one element of the crime, the taking and carrying away, took place in Jackson County. The second element, confinement, also began in Jackson County, Missouri. In a kidnapping according to the statute analyzed in *McGee*, we agree that it would be sufficient that the taking which took place in Jackson County vests jurisdiction in the State of Missouri. However, in order to

have jurisdiction in Missouri for a capital murder the essential element of the killing must occur or be inflicted within the state's boundaries. Likewise, the state's reliance on *State v. Johnson*, 115 Mo. 480, 22 S.W. 463 (1893) is also misplaced. Again, the court found in this concubinage case that the "taking away" was sufficient to vest jurisdiction in Missouri and was within the statute. Our research has developed no cases in the State of Missouri that supports jurisdiction for a capital murder charge where the essential element of the charge, the killing did not occur in the State of Missouri.

We find that *State v. Kleen*, 491 S.W.2d 244 (Mo.1973) is decisive. The charge in *Kleen*, was the issuance of an insufficient funds check under § 561.460 RSMo 1969. The facts were that defendant signed a check on a Missouri bank and delivered it to his truck driver in Missouri to be used to purchase grain and meal. The driver used the check in Tennessee for the purchase of grain for defendant. Defendant had pre-signed the check, but he had not noted the payee or the amount. There was no dispute the check was delivered in Tennessee or refused in Missouri (defendant's funds were insufficient). The court held that Missouri had no jurisdiction to prosecute for an offense that occurred in another state. Directly related to the present case the Supreme Court in so deciding relied upon a North Carolina opinion in the case of *State v. Hall*, 114 N.C. 909, 19 S.E. 602 (1894) which was a homicide case. Hall, while standing in North Carolina, shot and killed a man who was then in Tennessee, where he was wounded and died.

Our Supreme Court, citing the North Carolina *State v. Hall* opinion, recognized the general principle that one state cannot enforce the penal or criminal laws of another, or "punish crimes or offenses committed in and against another state or sovereignty." Our court quoted the North Carolina Court to say, "In view of the foregoing authorities, it cannot be doubted that the place of the assault or stroke in the present case was in Tennessee; and it is also clear that the offense of murder at common law was committed within the jur-

isdiction of that state. If this be so, it must follow that unless we have some statute expressly conferring jurisdiction upon the courts of this state, or making the act of shooting under the circumstance a substantive murder, the offense with which the prisoners are charged can only be tried by the tribunals of Tennessee ..."

In deciding the insufficient funds case where the original act which resulted in the delivery of an insufficient funds check in Tennessee occurred in Missouri and the check was refused in Missouri, our Supreme Court relied upon facts which are substantially similar in principle to the present case. It said, but did not hold, that the proper and only place for prosecution of the murder [in *State v. Hall*] was in the state where the blows were inflicted and death resulted. It rejected the argument now made by the state. We must follow that reasoning and holding. *See, Commonwealth v. Apkins*, 148 Ky. 207, 146 S.W. 431, 434 (Ct.App.1912) which stated, "[n]ot only at the common law, but in states where the question of jurisdiction is regulated by statute, courts have with a degree of uniformity held that the crime is committed at the place where the act is done which results in the injury or death and that prosecution for such act is properly conducted at the place where the act is done, and not where the death may occur." *See also, People v. Holt*, 91 Ill.2d 480, 64 Ill.Dec. 550, 440 N.E.2d 102 (1982).

We find that the trial court had no jurisdiction over the capital murder charge against the defendant for the murder of Donna Decker and reverse the conviction. Defendant may be tried only in Illinois, the situs where the fatal wound was inflicted, for that crime. In the issue of juror misconduct raised initially in support of defendant's motion for new trial we find it has not been fully heard by the trial court and remand for the purpose of completing the hearing on that issue and a ruling of the trial court. If it becomes necessary the trial court shall certify to this court a complete record on the hearing including a transcript and exhibits offered and considered. All other points raised by defend-

ant are reserved for further consideration of this court in particular those which may have been exacerbated by the jury misconduct issue.[3]

Judgment reversed in part and remanded in part.

PUDLOWSKI, P.J., concurs and concurs in separate opinion.

CRANDALL, J., concurs in part, dissents in part, in separate opinion.

PUDLOWSKI, Presiding Judge, concurring.

I concur in the principal opinion. I must assert that the stupidity of the two jurors is exceeded only by their arrogance and contempt of our justice system. Their actions are patently contemptuous. Any rational person would be aware that if they were selected as a juror in one venue and taken to another, the importance of the case dictated such action. It also would signify the need for an absolute compliance by the juror with the court's instructions. Their acts were deliberate.

It is the writer's opinion that the jurors' actions are legally contemptible and warrant punishment. The extent of the punishment should be determined by the trial judge. This was an expensive trial in terms of financial costs and time. Additionally, if the case has to be retried, it will be another emotional drain upon many people including the victims' immediate family. We have repeatedly admonished the citizenry to recognize the serious duties and responsibilities of a juror and obviously in this case, such admonishment had failed.

CRANDALL, Judge, dissenting.

I dissent in part and concur in part. I echo the displeasure expressed by my fellow judges over the conduct of the miscreant jurors, Aldrich and Robinson. The issue, however, is not whether these two men are contemptible, but whether the State met its burden of proving that the jurors were not subject to improper influences.

I agree that the State of Missouri had no subject matter jurisdiction over the capital murder of Donna Decker, who was shot and killed in the State of Illinois. The sentence that was imposed for that crime is therefore void.

I disagree with the remand on the issue of juror misconduct. Juror Aldrich saw two television newscasts regarding the trial, probably on Channel 5. Juror Robinson only saw the first newscast. The first newscast was a few seconds in length and the terms "re-trial" and possibly "mistrial" were used. The second newscast was viewed by Juror Aldrich after defendant had been found guilty of two counts of capital murder, but before the completion of the penalty stage. The two jurors also watched other television shows and listened to the radio. They did not hear that the case had been reversed or that the re-trial had been caused by the reversal. They did not hear the defendant had been sentenced to death at the prior trial or that Raphael Clark was a co-defendant. They both testified that they were not influenced by the television reports.

If misconduct is established, the State must affirmatively show that the jurors were not subject to improper influences. The trial judge held a hearing on that issue and found, in his discretion, that the State had met its burden.

Watching television or listening to the radio is not a violation of MAI–CR2d 1.08. The instruction admonishes the jurors not to "view or listen to any newspaper, radio,

---

**3.** (Defendant's Point VI) The trial court erred in denying a mistrial when the prosecutor told the jury that defendant had been previously tried for these charges by asking a state witness about his testimony in two prior trials; (defendant's Point V) The trial court erred in denying a mistrial when the prosecutor deliberately asked a State's witness where Danny Riley was at the time of trial and solicited the response, "He is dead", thereby making reference to an un- charged killing of Danny Riley, and associating it with defendant and co-defendant; and, (defendant's Point III) The trial court erred in permitting the evidence of .32 caliber automatic bullets seized from defendant's bedroom after his arrest, where there was no connection between these inflammatory exhibits and the crime, as shown by the state's consistent proof that non-automatic .32 revolver bullets were used in the Decker killings.

or television report *of the trial.*" (emphasis added) If Aldrich or Robinson had watched television and listened to the radio but had not seen anything about the trial, they would have violated the procedure established to ensure compliance with the instruction rather than the instruction itself. There would have been no juror misconduct as it related to the issue of whether or not defendant got a fair trial. There must be evidence of misconduct before the State is required to prove the absence of improper influences.

The viewing of the two newscasts is the only evidence of misconduct. The State clearly met its burden on the second newscast by proof of the verdict. That newscast was viewed by Juror Aldrich after the jury had found defendant guilty of two counts of capital murder, but before the completion of the penalty phase of the trial. At that point there was only two possible sentences, death or life with a minimum of 50 years without possibility of parole. The jury returned a verdict for the lesser sentence. There was, therefore, no prejudice as a matter of law.

Finally we consider the first television broadcast. There the issue of improper influence was a question of fact for the trial judge. If there is substantial evidence in the record to support his ruling, we, as an appellate court, should affirm.

Both jurors testified that they were not influenced by the broadcast. While that testimony is "hardly sufficient" proof of no prejudice, *State v. Malone,* 333 Mo. 594, 62 S.W.2d 909 at 915, it is probative on the issue. Next we consider the sentences imposed. Despite the extreme depravity of the crimes for which defendant was convicted, the jury did not recommend the death sentence. That fact, while not decisive, is also probative on the issue.

Finally we consider the broadcast itself. I disagree with the majority that the State and the defendant should be offered an opportunity to present the "identified video tape." They had an opportunity to present the tape at the hearing on the post-trial motion. If they had wanted the tape there, it would have been there. If defendant wanted a ruling on his request for the tape, he should have insisted on one. Further, it is not certain that the broadcast was made by Channel 5 or if the video tape of the broadcast still exists.

The testimony of the jurors regarding what they saw and heard was sufficient proof of the content of the broadcast. Certainly the tape would be probative, however, its production is not mandatory in order to adjudicate the issue.

The testimony before the trial court was that the broadcast was a few seconds long; showed the defendant in custody; and the words "re-trial" and "mistrial" were used. The fact that the defendant was in custody would hardly have surprised the jurors. "Re-trial" and "mistrial" do not have, nor do the words logically infer, any prejudicial connotation. The words as used in the context of the broadcast were innocuous. The content of the broadcast, combined with the other factors previously mentioned, justify a finding that the jurors were not subject to improper influences.

For the foregoing reasons, I dissent.